## STATE OF NEBRASKA, EX REL. FRANK N. PROUT, ATTORNEY GENERAL, v. NEBRASKA HOME COMPANY.

### FILED NOVEMBER 19, 1902. No. 12,613.

1. **What Constitutes a Lottery.** To constitute a lottery it is necessary that a prize be offered, and something of value be given for a chance to obtain the prize.

2. **What Constitutes a Prize.** The prize may be anything of value; a preference or privilege in the distribution of a common fund among those entitled thereto, may constitute a prize.

3. **Lottery.** A scheme whereby a common fund is to be produced by the contributions of various parties, and afterwards distributed among the parties contributing thereto, and a valuable preference or privilege in the distribution thereof is made to depend upon chance, is a lottery within the meaning of our statute prohibiting lotteries.

4. **Contract: PUBLIC POLICY.** Contracts in which a corporation, in consideration of stated payments made to it, makes promises, which are the main inducement to such contracts, and are impossible to perform, are unlawful, being against public policy.

5. **Quo Warranto.** A corporation, organized under the laws of this state, which is engaged in a business forbidden by statute, or unlawful as against public policy, may be deprived of its charter and dissolved by proceedings in quo warranto.

ORIGINAL action in the nature of quo warranto to annul the corporate existence of the defendant for misuse and abuse of its corporate franchise, the abuse complained of being, as is alleged, the soliciting, selling and executing unlawful contracts for the ostensible purpose of assisting the purchasers thereof in procuring homes. The petition set out a contract. The answer denied the issuance of any such contract, but set out three other forms which it alleged were issued; and alleged the lawfulness of these and all other contracts issued. *Writ allowed.*

*Frank N. Prout, Attorney General, Norris Brown* and
*William B. Rose,* for relator:

The following provision is common to all the contracts:

Nebraska Home Company hereby agrees and undertakes
to assist the said holder of this contract in purchasing and
paying for a home.

Each of the contracts pleaded by defendant discloses the
following scheme:

Contracts are numbered numerically as applications are
received at the home office in Omaha.   Each applicant
must pay the company $3 for its services in registering and
issuing the application and contract.   Each holder is re-
quired to pay to the company at Omaha $1.35 a month
until the contract matures.   Out of each instalment of
$1.35 the company retains 35 cents for its services and
deposits $1 "in a fund to be known as a home fund."
After maturity of a contract the holder is required to pay
to the company $5.35 a month until his payments to the
home fund amount to $1,000.   Out of each monthly in-
stalment of $5.35 the company retains 35 cents for its
services, and deposits $5 in the home fund.   All contracts
pleaded in the answer contain the following provisions
relating to maturity:

Sixth. This contract shall be deemed to be matured
within the meaning hereof when there shall be, over and
above what is required to be paid out on the contracts of
lower serial number than this contract, either, first, an
income of $50 per month due said home fund from con-
tract-holders; or, second, an amount of money in said
home fund which, when added to the income so due from
contract-holders for a period of twenty months, will equal
$1,000.

Seventh. When this contract matures, the company
agrees on each and every month thereafter, for twenty
months, to pay out of the said home fund the sum of $50,
in assisting the holder to purchase a home, to pay off a
mortgage on a home owned by the holder, or to erect a
dwelling-house on a lot belonging to the holder, as said
holder may prefer.

It is understood and agreed that the holder shall select

property of the value of $1,000, on the basis of said payments thereon of $50 per month, and thereupon the company shall immediately proceed to investigate title, and value of the property, and, as soon as possible, notify the holder of its approval or disapproval of the holder's selection.

An examination of the contracts discloses the fact that the company does not devote any capital to the enterprise. Whatever it undertakes to do must be accomplished with the funds invested by contract-holders. In substance, it is a concern without any capital, except the monthly payments of $1.35 or $5.35, where all the contract-holders are borrowers to the extent of $1,000 each, and where the promoters of the enterprise take for their services twenty-five per cent. of $1.35-instalments and six per cent. of $5.35-instalments. The plan requires the company to keep its treasury empty, and, with the exception of the holder of contract number one, no holder has any interest in the home fund until the holders of earlier contracts have been paid in full.

The results of investments are affected by the number of persons who purchase contracts and by the number of holders who violate the contracts already made. No person can make in advance an intelligent estimate of the number that will be found in either class. The practical results of the plan, therefore, can not be determined by the rules and principles applicable to ordinary business enterprises. No one can tell when a contract will mature. The scheme of the company is such that the reason, foresight, and sagacity of man will not enable him to ascertain when a holder will get a return for the definite instalments he is required to pay with scrupulous punctuality at exact periods of time. The practical workings of the plan, therefore, can only be ascertained by assuming a basis for computation.

The company in its answer admits that it has issued 743 contracts, and it will be fair to show how its contracts will mature on the basis of a membership of 1,000, all bearing the same date, and each member paying his instal-

State v. Nebraska Home Co.

| No. of 20-month period. | No. of months period ends from inception of company. | No. of contracts matured each period. | Home fund for distribution each period. | Per cent of contracts called and matured to date. | Total home fund collections to date. | Profit to Home Co. each period. | Per cent. which money received by Home Co. bears to total collections. |
|---|---|---|---|---|---|---|---|
| 1 | 20 | 22 | $21760.00 | 2.2 | ............ | $10000.00 | 32. |
| 2 | 40 | 23 | 23600.00 | 4.5 | ............ | 7000.00 | 27. |
| 3 | 60 | 26 | 25680.00 | 7.1 | ............ | 7000.00 | 25. |
| 4 | 80 | 28 | 27920.00 | 9.9 | ............ | 7000.00 | 24. |
| 5 | 100 | 30 | 30320.00 | 12.9 | ............ | 7000.00 | 22.7 |
| 6 | 120 | 33 | 32960.00 | 16.2 | ............ | 70 0.00 | 21.7 |
| 7 | 140 | 36 | 35840.00 | 19.8 | ............ | 7000.00 | 21.5 |
| 8 | 160 | 39 | 38960.00 | 23.7 | ............ | 7000.00 | 20. |
| 9 | 180 | 42 | 42320.00 | 27.9 | ............ | 7000.(0 | 19.1 |
| 10 | 200 | 46 | 46000.00 | 32.5 | $325360.00 | 7000.00 | 18. |
| 11 | 220 | 48 | 47180.00 | 36.2 | ............ | ............ | ...... |
| 12 | 240 | 48 | 48140.00 | 42.1 | ...... | ............ | ...... |
| 13 | 260 | 49 | 48820.00 | 46.9 | ............ | ............ | ..... |
| 14 | 280 | 49 | 49220.00 | 51.9 | ............ | ............ | ...... |
| 15 | 300 | 48 | 48440.00 | 56.7 | ............ | ............ | ...... |
| 16 | 320 | 48 | 47840.00 | 61.5 | ............ | Total profits | ...... |
| 17 | 340 | 47 | 46740.00 | 66.2 | ............ | to Home | ...... |
| 18 | 360 | 45 | 44980.00 | 70.7 | ............ | Co. | ...... |
| 19 | 380 | 41 | 41580.00 | 74.8 | ............ | ............ | ...... |
| 20 | 400 | 39 | 38900.00 | 78.7 | 787200.00 | 73000.00 | 8.4 |
| 21 | 420 | 36 | 35900.00 | 82.3 | ............ | ............ | ...... |
| 22 | 440 | 33 | 32740.00 | 85.6 | ............ | ............ | ...... |
| 23 | 460 | 28 | 28280.00 | 88.4 | ............ | ............ | ...... |
| 24 | 480 | 25 | 24720.00 | 90.9 | ............ | ............ | ...... |
| 25 | 500 | 21 | 21240.00 | 93.0 | ............ | ............ | ...... |
| 26 | 520 | 18 | 17920.00 | 94.8 | ............ | ............ | ...... |
| 27 | 540 | 14 | 14000.00 | 96.2 | ............ | ............ | ...... |
| 28 | 560 | 11 | 11120.00 | 97.3 | ............ | ............ | ...... |
| 29 | 580 | 9 | 8660.00 | 98.2 | ............ | ............ | ...... |
| 30 | 600 | 6 | 6460.00 | 98.8 | 988240.00 | 73000.00 | 6.9 |
| 31 | 620 | 4 | 4280.00 | 99.2 | ............ | ............ | ...... |
| 32 | 640 | 3 | 2960.00 | 99.5 | ............ | ............ | ...... |
| 33 | 660 | 2 | 1920.00 | 99.7 | ............ | ............ | ...... |
| 34 | 680 | 1 | 1160.00 | 99.8 | ............ | ............ | ...... |
| 35 | 700 | 1 | 660.00 | 99.9 | ............ | ............ | ...... |
| 36 | 720 | 0 | 560.00 | 99.9 | ............ | ............ | ...... |
| 37 | 740 | 0 | 720.00 | 99.9 | ............ | ............ | ...... |
| 38 | 760 | 0 | 760.00 | 99.9 | 999760.00 | ............ | ...... |
| 39 | 761 | 0 | 900.00 | 99.9 | ............ | ............ | ...... |
| to | to | | | | | | |
| 45 | 900 | ..... | 1000.00 | ...... | ............ | ............ | ..... |
| 46 | 920 | 1 | 1000.00 | 100.0 | 1000000.00 | 73000.00 | 6.8 |

ments according to his agreement. This basis has been selected because it affords an easy means of computation. For assistance of the court in determining the practical results of defendant's scheme,—on the basis assumed only, if it were possible to carry it out according to the plan disclosed by the contracts,—an expert's table, based on a membership of 1,000, is inserted herein. The table is applicable to all contracts, but, under the first contract set out in the answer, the company's profit would be greater than that shown by the table. To facilitate calculations all contracts, for the purposes of the table, are matured on the first month of each twenty-month period. Time has been divided into twenty-month periods because twenty months are required to pay a contract when matured.

The scheme of defendant is impracticable, and it can not keep its promises. The enterprise will collapse, and many contract-holders will lose their investments.

The superior court of Cincinnati said of a somewhat similar scheme:

The averments of the petition, if true, show the defendant company to be nothing more nor less than the promoter and operator of a lottery or scheme of chance, whereby certain shareholders, lucky ones, they may be called— although the averments of the petition warrant calling the luck in some cases fraud—are enabled by the methods pursued by the company to be paid out in advance of the less lucky fellows.

Experience has demonstrated one inevitable result to all such enterprises, viz., that there comes a time when the influx of credulous people to these societies ceases, and as the money paid out to the lucky members has been wholly and grossly out of proportion to their contributions or investments, or to the natural earnings of such contributions and investments, these societies necessarily collapse, leaving the unlucky members to bear the losses or, what is the same thing, leaving nothing in the treasury of the society out of which these members may recoup themselves for their stated contributions and investments. *Shaw v. Interstate Savings, Loan & Trust Co.*, 8 Ohio Dec., 510.

In *McLaughlin v. National Mutual Bond & Investment Co.*, 64 Fed. Rep., 908, 909, a scheme quite similar to that of the Nebraska Home Company was described by Judge Dallas. It was shown that the returns of an investor would be less than the amount invested. The court said:

Of course, any misguided person who might be led into such a transaction would, on perceiving its character, hasten to withdraw from it, even at the sacrifice of payments already made.

The Nebraska Home Company's contracts are unlawful for the reason that they require the corporation to discriminate between investors, giving some an unreasonable profit at the expense of others.

The Nebraska Home Company collects from investors unconscionable compensation for services.

Unconscionable terms imposed by investment companies upon investors are unlawful and can not be enforced.

In *United States v. McDonald*, 59 Fed. Rep., 563, the court investigated a scheme similar to that operated by the Nebraska Home Company. The report of the case shows that the investment was in the nature of a bond; that the purchaser paid a fee of $10, and agreed to pay, for a time, each succeeding month, $1.25, the 25-cent items being retained by the company for services and the $1-instalments constituting a trust fund for the redemption of bonds; and that the bonds could not be redeemed, under the plan on which the enterprise was based, for an indefinite length of time. In speaking of compensation Judge Grosscup, United States district judge, said (p. 565):

That is plunder of the public. It is said that this has been done fairly. The court, of course, is not sitting here to pass upon the fairness of any such transaction. Two hundred years ago, when coaches were robbed by highwaymen on the heaths of London, it was always said that the highwaymen acted with courtesy, but nobody but an ignorant fool returned to London without knowing he had been plundered.

This language was used in an instruction to the jury, and the United States circuit court of appeals held on

review that the instruction was not erroneous. *MacDonald v. United States,* 12. C. C. A., 339, 344.

In the case of *In re Bankruptcy of Security Tontine Investment Co.,** Judge Munger, of the federal court for the district of Nebraska, had occasion to determine the character of an investment company operated on a plan similar in some respects to that of the Nebraska Home Company. The investors paid small monthly instalments, part of each being retained for the benefit of the company and the remainder constituting a trust fund .for the purchase of diamonds. Judge Munger approved the following findings:

Of the $110 paid into the treasury of the corporation by each contract-holder the corporation confessedly retains $27.50 for its services; another $17.50 becomes the property of the corporation under its reserve-fund feature; and later, by inducing the contract-holder to accept $160 in cash in lieu of the diamond provided for in the contract, the corporation secures another $40.   *   *   *   Thus it will be seen that of each $110 paid in by contract-holders the corporation proposes to retain $80 as compensation for nursing the remaining $30, and at the end of seventy weeks return to each contract-holder maturing his contract the sum of $160 in cash, provided it is in the treasury of the corporation. Here, as is the case with the ordinary confidence man and his confederates, a favored few are given contracts bearing low numbers, and these, as a reward for using them as an advertising medium, reap a handsome profit at the expense of their misguided friends and neighbors.

The testimony discloses that of the matured contracts the corporation paid off 101, yet it never owned nor delivered but one diamond, and this to the holder of contract No. 1. The only apparent reason for injecting into the contract the clause in reference to the diamond was in an endeavor to relieve the contract of its otherwise unlawful character. This attempted evasion adds to the viciousness of the contract without accomplishing the desired result. The business in which the corporation was engaged is contrary to public policy. Its contract is so unconscionable

*Unreported.

that no court would enforce its provisions, and its scheme is so shallow that it seems remarkable it should have ever met with any degree of success.

The rule in this state is that stipulations imposing unconscionable terms upon investors are unlawful and can not be enforced. *Randall v. National Building, Loan & Protective Union*, 43 Nebr., 876.

It is the policy of the law to make savings and investment institutions safe and economical, and to protect investors from fraud and plunder. An investment company employing no capital in its business and operating under a plan which requires it to keep its treasury empty, should not be permitted to use its charter to solicit contracts of investment without security.

The charter of a swindling concern was canceled by the supreme court of Pennsylvania for infirmities resembling some of those already mentioned. One of the objectional features was described by the auditor as follows:

The direct influence of the scheme was to induce each certificate-holder to "rope in" as many as possible behind him, in order the more quickly to mature his own certificate. *National Endowment Co.*, 142 Pa. St., 450, 454.

In the case cited the court approved the above finding and itself used the following language applicable to defendant in this case (p. 460):

It manifestly belongs to that class of associations, by far too numerous, the practical effect of whose operations is to enrich a few at the expense of confiding and ignorant people.

A provision in a contract of investment for forfeiture to the investment company of all investments, upon default in payment of instalments, is unconscionable and unlawful.

The Nebraska Home Company is conducting a lottery, or scheme of chance, and its contracts for the promotion and operation of that enterprise are unlawful.

The state insists that defendant is operating a lottery or scheme of chance in violation of statute. Section 224 of the Criminal Code provides:

If any person shall open, set on foot, carry on, promote, make, or draw, publicly, or privately, any lottery, or scheme of chance, of any kind or description, by whatever name, style, or title the same may be denominated or known,   *   *   *   every person so offending shall be fined in any sum not exceeding five hundred dollars.

Defendant's contracts may as well be called the tickets. *MacDonald v. United States.* 12 C. C. A., 339, 344; *United States v. Fulkerson,* 74 Fed. Rep., 619, 628. The consideration is a $3-fee and the monthly instalments of $1.35. The prize is a matured contract which gives the holder thereof the right to use without interest for a long term of years large sums of money.

Even if defendant were able to show that each contract-holder would eventually obtain a $1,000-home, it would not prevent the scheme from being a lottery. *Horner v. United States,* 147 U. S., 449, 463; *Ballock v. State,* 20 Atl. Rep., [Md.], 184; *State v. Mumford,* 73 Mo., 647; *United States v. Wallis,* 58 Fed. Rep., 942.

In *Randle v. State,* 42 Tex., 580, the court said (p. 591) :

The fact of each ticket-holder being certain to receive something did not relieve it from the character of a lottery.

Under defendant's scheme the prizes are not equal. A home in two years may be a prize of great value, but what of homes in seventy-five years? Before that time all the present contract-holders will have homes marked by little mounds under the willows.

The relation existing between the Nebraska Home Company and each contract-holder is one of trust and confidence. The contracts provide for an abuse of the fiducial relation, and are, therefore, contrary to public policy and unlawful.

Contracts may violate public policy, though they do not conflict with any statutory or constitutional provision. *Teal v. Walker,* 111 U. S., 242, 252; *Wilde v. Wilde,* 37 Nebr., 891; *Fitzgerald v. Fitzgerald & Mallory Construction Co.,* 41 Nebr., 374, 376.

Contracts against public policy are uniformly con-

demned by the courts as unlawful. *Atcheson v. Mallon,* 43 N. Y., 147; *Richardson v. Crandall,* 48 N. Y., 348; *State v. Interstate Savings Investment Co.,* 52 L. R. A., 530; *Drexler v. Tyrrell,* 15 Nev., 114, 134; *Firemen's Charitable Ass'n v. Berghaus,* 13 La. Ann., 209; *Elkhart County Lodge v. Crary,* 98 Ind., 238, 242; *Shipley v. Reasoner,* 80 Ia., 548; *Edwards v. Randle,* 63 Ark., 318; *Fearnley v. De Mainville,* 5 Colo. App., 441.

A corporation has no authority to enter into an unlawful contract.

Corporations can only be organized for the purpose of transacting a lawful business. They can not enter into unlawful contracts, whether forbidden by statute or otherwise. The power of the courts to dissolve a corporation for abusing its franchise is complete. These propositions need no elaboration. The time for disputing the rules stated has long since elapsed. *State v. Council Bluffs & Nebraska Ferry Co.,* 11 Nebr., 354; *State v. Nebraska Distilling Co.,* 29 Nebr., 700.

*George A. Neal, Edwin M. Coffin* and *Elliott J. Clements, contra:*

The business conducted by the defendant has none of the elements of, and is in no sense, a lottery.

A lottery is defined by Webster as, "A scheme for the distribution of prizes by lot or chance." By Worcester as, "A distribution of prizes and blanks by chance; a game of hazard in which small sums are ventured for the chance of obtaining a larger value, either in money or other articles." By Bouvier's Law Dictionary as, "A scheme for the distribution of prizes by chance." By Black's Law Dictionary as, "A distribution of prizes by chance or lot, where a valuable consideration is given for the chance of drawing a prize."

None of the foregoing definitions, by any proper or reasonable construction, can be made to apply to the defendant's business, and we are unable to understand in what sense it can be denominated a lottery when tried by any definition of the term.

The statute was designed to prevent the operation of a well understood concern, and has been enlarged to correct and prevent the development of a spirit of gaming. In any kind of lottery, prizes are given the few and blanks the many. A prize in the sense of a reward by means of a lottery is a return largely in excess of the cost.

The plan of this company offers no prizes. Every man is obliged to return every dollar paid to his use. The property purchased for him is pledged to this and is security to the other contract-holders.

The purchase of oil and mining stock is more of gaming, and more nearly a lottery. The applications for contracts are dated and fix the priority of members, but the contract is not completed until signed by the contract-holder who has the number of the contract when executed. But it is objected that some receive benefits sooner than others. This is true in any kind of mutual aid business. In building and loan companies there is never money enough on hand to accommodate but a few at a time. The many must wait. "But," it is argued, "the men who wait in building and loan companies are allowed interest on their monthly payments." While this may be an argument in favor of such companies, can it be said the agreement not to charge interest is fraudulent? The amount paid on a thousand dollars, in the way of dues into this company, is but twelve dollars per year and the interest at 6 per cent. for the average of the sum (since it requires a year to collect that amount) would be thirty-six cents, while a building and loan company would collect in the way of dues on one thousand dollar certificates, from $60 to $100. Interest on these larger sums would be worth charging. The principle of waiting is the same with both companies. If the man who waits is allowed no interest he is charged none. All investments require time for development. Men make contracts for long periods to obtain benefits.

If the drawing only determines the time when the benefit is to be received, the mere determining of that time by lot or drawing, does not give the characteristic of a lottery.

*United States v. Zeisler*, 30 Fed. Rep., 499; *Horner v. United States*, 147 U. S., 449.

*Neal*, further:

The objection to the taking of money by one to use for another has been made in cases of bond investment societies that are only investment in name, in which the accumulations derived from a great number are paid out to some one person, who ceases to remain a member, and who takes the money and gets away with it, leaving the contributors short to that extent. With this company that objection can not obtain, since the money is invested in real estate and the return of it is secured. In those other cases the reason of the objection is apparent, viz., the loss of the assets, and with the passing of the reason there should be the death of the objection. This system of the defendant is not only not gaming; the contract is not only not a gambling contract, but it is diametrically opposed to gambling. It has the savings-bank idea, in which economy and thrift are encouraged instead of the spirit of gaming. An account is kept with each contract-holder, who is given credit for his monthly dues when paid, just as with depositors in a savings bank.

*Edmund M. Bartlett, Charles L. Dundy* and *Edward M. Martin*, also for defendant in error:

We find appended at the end of the briefs the names of the following officers representing the state, viz., Frank N. Prout, Attorney General; Norris Brown, Deputy Attorney General; Wm. B. Rose, Assistant Attorney General. They, like the three tailors of Tooley street, London, resolved as "We, the people."

We are informed that William B. Rose prepared the document known as "Brief of State," to which the above names are appended. It seems somewhat remarkable that all of these names should be signed to the brief of state. We doubt if either the attorney general or his deputy, the only lawful officers of the state whose names appear to the

brief, have given the subject careful consideration. If doubt exists as to the correctness of the position assumed in the brief of state upon such a virulent attack as therein contained, there seem to be three heads to share the burden of mistake; or one may to the other say, in the language of Macbeth:

> "Thou canst not say I did it: never shake
> Thy gory locks at me."

But when we take into consideration the conglomerate mass of false premises, inconsistencies, misapplication of the law and venomous outpourings of malevolent denunciation, this combination with the three signatures so unusual in affairs of state or more properly official documents, reminds one of that other situation in Macbeth. The three witches, a dark cavern and a cauldron boiling amidst thunder. Says the

1st Witch.  Thrice the brinded cat hath mew'd.
2d Witch.  Thrice; and once the hedge-pig whin'd.
3d Witch.  Harper cries:—'Tis time, 'tis time.
1st Witch.  Round about the cauldron go;
In the poison'd entrails throw.—
Toad, that under coldest stone,
Days and nights hast "*twenty months*,"
Swelter'd venom sleeping got,
Boil thou first i' the charmed pot.

All together. Double, double, toil and trouble, etc.

2d Witch.  Fillet of a fenny snake,
In the cauldron boil and bake;
Eye of newt, and toe of frog,
Wool of bat, and tongue of dog,
Adder's fork and blind-worm's sting,
Lizard's leg, and owlet's wing,
For a charm of powerful trouble;
Like a hell-broth boil and bubble.

All together. Double, double, toil and trouble, etc.

3d Witch.  Scale of dragon, tooth of wolf;
Witch's mummy; maw, and gulf,
Of the ravin'd salt-sea shark;
Root of hemlock, digg'd i' the dark;
Liver of blaspheming Jew;
Gall of goat, and slips of yew,
Silver'd in the moon's eclipse;
Nose of Turk, and Tartar's lips;

> Finger of birth-strangled babe,
> Ditch-deliver'd by a drab,
> Make the gruel thick and slab;
> Add thereto a tiger's chaudron,
> For the ingredients of our cauldron.

All together. Double, double, toil and trouble.
Fire, burn; and, cauldron, bubble.

2d Witch. Cool it with a baboon's blood.
Then the charm is firm and good.

   *  *  *  *  *

By the pricking of my thumbs,
Something wicked this way comes.
Open, locks, whoever knocks.

Now compare the above with the ingredients put by the three gentlemen into the seething cauldron of their brief and we have found a fair precedent and authority for their language.

These are some of the "ingredients":

> Infamous contracts,
> Swindling concern,
> Cunning device,
> Discrimination,
> Individual favorites,
> Insolvent concerns,
> Stipulations to prevent a purchase,
> Wild-cat enterprise,
> Triumphant rascality,
> All rascaldom,
> Disreputable lawyers,
> Little mounds under the willows,
> Odious provisions,
> Bogus assistant,
> Perpetual insolvency,
> Plague,
> Promoters and their friends,
> Partiality, favoritism.
> Unlawful profit,
> Unconscionable compensation for services,
> Cheap veneering of solicitude,
> The table answers the questions,
> Simulated enterprises,
> Stipulations imposing unconscionable terms,
> Fiducial relation,

Iniquitous purpose,
Unequal value,
Scheme of chance,
Distribution of prizes by lot,
Lottery,
Scheme for the abuse of the relation of trust and
    confidence,
Abuse and betrayal of fiducial relations,
Age of deception and fraud,
Misguided persons,
The sovereign has not been exalted,
Abuses,
Unlawful contracts,
Concern without capital,
Large profit to company,
Empty treasury,
Collapse,
A cheat,
Swindle,
Murder,   .
All honest and trustful men take alarm.

It is very much the same thing, the striving for effect, and if the court shall be lost in the hypnotic charm of the above ingredients they may, with the witch, by the pricking of their thumbs, know that something wicked this way comes. This wicked thing could be discerned only by the application of the above ingredients, not by any principle or authority.

*T. L. Norval, Richard S. Norval* and *B. F. Norval, amici curiæ*, argued that the defendant's contracts had none of the elements of a lottery, citing *Buckalew v. State,* 62 Ala., 334; *Yellow-Stone Kit v. State,* 88 Ala., 196; *Randle v. State,* 42 Tex., 580; *State v. Overton,* 16 Nev., 136; *Wooden v. Shotwell,* 23 N. J. Law, 465; *State v. Clarke,* 33 N. H., 329, 335.

*Andrew G. Wolfenbarger, amicus curiæ:*

Five laborers are enabled to save $4 a month each, after paying the family expenses, including $16 a month house-rent in each case. In talking over their plans they find

that each is striving to get a $1,000-home. One of them suggests that they put their money together and cooperate, to the end that each get a home. They know that by working alone it will be 138 months before any one can accomplish his purpose, including interest on his money. So they put their money together and buy a home for number one, who then puts into the common fund the $16 he has been paying a month as rent, in addition to his savings; then their combined savings are $36 a month, and in 27 7-9 months they have saved enough to buy a home for number two; then their combined savings are $52 a month, so in 19 3-13 months more they buy a home for number 3; then their combined savings are $68 per month, so in 14 12-17 months they buy a home for number four; then their combined savings are $84 per month, and in 11 19-21 months they buy a home for number five. Number five, by this cooperation, would get his home in 75 months, and have it all paid for in 100 months, making a net saving to the last man of 38 months over what would have been possible without cooperation. When the 138 months that it would have taken them to secure homes without cooperation have expired, they find that by this cooperation they have paid for their homes and have combined savings of $6,300 in addition thereto. After paying $1 each per month as expenses, it leaves a net combined saving of $5,610, besides their homes. The above illustration is based on exactly the same proportional relation of payments to benefits as that set forth in defendant's contract, but the sums paid each month are larger. The principle is identical.

*Frank N. Prout, Attorney General, Norris Brown* and *William B. Rose,* in reply:

The scheme to collect large sums in small amounts from many and invest the funds thus created in homes to be allotted by chance among a few, seems to have originated with Feargus O'Connor, the chartist leader. "Chartism," writes Carlyle, "means the bitter discontent grown fierce

and mad, the wrong condition therefore or the wrong disposition, of the working classes of England." That O'Connor's home-scheme was chiefly the product of insanity can scarcely be doubted. He inaugurated his enterprise October 24, 1846, as the "Chartist Co-operative Land Company," and afterward changed the name to the "National Land Company." A biographer says that "the most extravagant hopes of an idyllic country life were held out to the factory hands and others who subscribed." The House of Commons examined the affairs of the National Land Company June 6, 1848, and the concern was found to be bankrupt. O'Connor died a lunatic. History records:

There can be little doubt that O'Connor's mind was more or less affected from the beginning, and that he inherited tendencies to insanity. He was insanely jealous and egotistical, and no one succeeded in working with him for long. In all his multitudinous speeches and writings it is impossible to detect a single consistent political idea. 41 Dictionary of National Biography, 402.

In exposing O'Connor's home-scheme and the National Land Society, the Nottingham Journal published the statement that O'Connor "had wheedled the people of England out of 100,000*l.*"; whereupon O'Connor sued the publisher of that journal for libel. The report of the case shows (*O'Connor v. Bradshaw*, 5 Ex. [Eng.], 881, 844):

The objects of the society were to purchase land, erect dwellings thereon, and allot them to its members on such terms as should enable them to become small freeholders, and live in comfort and independence; which objects were to be effected in the following way:—A large sum of money was to be raised by shares of 1*l.* 6*s.* each, and was to be laid out in the purchase of land and the erection of houses. The subscriber of two shares, or 2*l.* 12*s.*, became entitled to a house, two acres of land, and an advance of 15*l.*; the subscriber of three shares to a house, three acres of land, and 22*l.* 10*s.* Their right, however, to obtain these privileges was not absolute, but depended on the result of the ballot, according to which a small number only of the subscribers could obtain present possession of houses, lands and money; so that in five years, during which the plan was in

operation, out of 70,000 shareholders, 227 only had obtained allotments.

The report of the case further shows (p. 887) :

The Lord Chief Baron, in his direction to the jury, told them that, in his opinion, the whole of the plaintiff's scheme was illegal, on the ground of its being contrary to the bank act and to the lottery acts.

O'Connor's suit was dismissed, but it is fair to state that Parke, B., who discharged the rule for a new trial, disregarded the lottery act, saying (p. 892) : "Now if the question were to turn upon this, whether it was or was not illegal within the meaning of that act, I should like to take further time for consideration."

After chartism had died out in England, after its leader and the National Land Society had been almost forgotten, and after Coxey had begun to mobilize his army in this country, Avarice, Greed and Rascality started out to find some wholesome plan for the betterment (?) of the common people. They discovered the chief elements of O'Connor's home-scheme, brought them to the District of Columbia, and there incorporated under the name and style of the "National Investment Company." A few extracts from the by-laws of this society will disclose its character and the kinship between its scheme and that of defendant:

The terms and conditions contained in the certificate of shares, together with those contained in the application therefor and the by-laws of the society taken together shall form the contract between the shareholder and the society. Art. 2, sec. 5.

This society will issue shares to the amount of $50,000,-000 in denominations of $100 and $50, the $100 shares being designated as "A" shares and the $50 shares as "B" shares, and the same will be issued to applicants therefor in certificates containing ten shares only, each share bearing a separate number consecutively from one to ten, both inclusive, the payment of which shares at maturity is guaranteed by the society in accordance with the provisions of article 7 hereof. All applications for shares will be num-

bered in the order received without regard for the denomination of shares applied for.   Art. 6, sec. 1.

Whenever the redemption fund of the society contains an amount equal to the face value of the share next in order of maturity, notice thereof shall be sent to the holder of such share and the same will be paid upon receipt of the proper coupon duly receipted.   Art. 7, sec. 1.

Shares will be matured in the following order, to wit: The first share in order of maturity will be share No. 1 in certificate No. 1, then share No. 1 in certificate No. 2, and so on, paying the first share in each certificate in force, until the end of one year from date of the payment of the first share, when share No. 2 in certificate No. 1 will be next in order, then share No. 2 in certificate No. 2, and so on until the second or lowest numbered share in each certificate issued during the previous year and still in force has been paid, when share No. 3 in certificate No. 1 will be next in order, then share No. 3 in certificate No. 2, and so on as before, until the third or lowest numbered share in each certificate issued during the previous years and still in force has been paid, when share No. 4 in certificate No. 1 will be next in order, and so on as before until each share in certificate No. 1 has been used as a basis or starting number and the ten series finished, after which the lowest numbered share in the lowest numbered certificate in force will be the basis or starting number and the same rule followed as in previous series, for all time.   Art. 7, sec. 2.

Each application for shares in this society must be accompanied by one regular monthly instalment thereon, otherwise the same will not be considered as received.   Art. 8, sec. 1.

Each shareholder will be required to pay a monthly instalment of seventy cents per share on each "A" share and thirty-five cents per share on each "B" share, the first instalment on which must be paid when the application is made, and the other instalment must be paid on or before the first business day of each month following date of issue of the certificate, except that all certificates bearing date after the twentieth of the month of issue will not be liable for the instalment falling due the first of the month following said date.   Art. 8, sec. 2.

All monthly instalments shall be payable at the home office of the society on or before the first business day of

each month without notice, and all payments made by this
society shall be payable there also; but if for the sake of
convenience or otherwise any instalments are paid to col-
lectors or attorneys of the society, such collectors or
attorneys shall be deemed and held to be the agent or at-
torney of the shareholder so paying, unless the said col-
lector or attorney has been duly authorized by the said so-
ciety in writing to receive said payments and furnishes a
receipt for that instalment signed by the secretary of the
society.

Failure of a local collector or attorney to call for any
instalment shall be no excuse for failure to pay the same
when due; the shareholder must bring or send the same
to the home office of the society or to one of its authorized
collectors before it is due, otherwise the usual fine will be
added and forfeiture enforced. Art. 8, sec. 3.

The income of this society shall be divided into three
funds, to wit: The redemption fund, reserve fund and ex-
pense fund. Art. 10, sec. 1.

The redemption fund shall consist of fifty cents out of
each monthly instalment paid on "A" shares after the first
two instalments, and twenty-five cents on each "B" share,
and no portion of such fund shall be used for any purpose
other than the redemption of matured shares. Art. 10,
sec. 2.

The reserve fund shall consist of ten cents out of each
monthly instalment paid on "A" shares after the first two
instalments, and five cents on each "B" share, also eighty
per cent. of all fines paid by shareholders, together with
all accretions thereto from interest and other sources. Art.
10, sec. 3.

Said fund shall be deposited in some solvent interest-
paying bank or invested in government bonds, first mort-
gages or other first-class interest-bearing securities, the
same to be registered or recorded in the name of the society
and shall be the sole property of the shareholders thereof.
Art. 10, sec. 4.

The full amount contributed to the reserve fund of this
society on account of any certificate issued by it which has
been continued in force for ninety-six months from the
first day of July or January next after date thereof, shall
be credited thereto, as will also its proportionate share of
all accretions to said fund from lapses, fines and interest,

and the amount so credited to any certificate may be used in the payment of monthly instalments thereafter falling due thereon. The amount standing to the credit of any certificate at the time of maturity of the last share named therein, shall be added to and paid with said share. Art. 10, sec. 5.

The expense fund shall consist of that portion of the income of the society not set apart for the redemption and reserve funds aforementioned and shall be used in properly conducting the business of the society. Art. 10, sec. 7.

Any shareholder whose certificate is not in arrears may transfer the whole or an interest therein to any other person, by obtaining the consent of the secretary of the society and paying a transfer fee of fifty cents. Art. 11, sec. 1.

Any holder of "A" shares who desires may at any time exchange the same for "B" shares by making application therefor and paying a reduction fee of fifty cents. In this case a new certificate will be issued bearing same date and number of shares as the one surrendered. Art. 11, sec. 2.

The postmaster at Washington excluded the National Investment Society's literature from the mails on the ground that its scheme was a lottery and a fraud, and the society applied to the supreme court of the District of Columbia for a writ of mandamus to compel him to receive and mail the matter excluded. The scheme was held to be a lottery, and the action dismissed. The certificates issued by the National Investment Society were numbered in the following manner:

All applications for shares will be numbered in the order received.

Judge McComas held that this system of numbering imparted to the plan the element of chance. On this point he said in his opinion:

The plan of this National Investment Society, as set forth in the letter, circular and by-laws, shows that it is impossible for the members to share equally in the funds, and that the more fortunate applicants are those whose certificates bear the earliest numbers; that the number of the certificates, and their consequent value, depends upon chance. In different states, applicants, on the same day,

30

may mail subscriptions for certificates in this company. Whether or not an applicant will receive a certificate of one number or another depends upon the order in which the applications may reach the officer of this company who issues the certificates, and that is a matter of chance. This officer receives these applications by mail, or otherwise; it may be one at a time; it may be many at the same time; and, according to the order in which he chances to receive them, or as he chances to take up one or another, and determines the number of each applicant's certificate, the certificates are numbered and issued.  *  *  * It is this element of chance in the numbering of the certificates which I believe to be a violation of this anti-lottery law.

This case is *United States v. Sherwood,** No. 36,128, in the supreme court of the District of Columbia. The foregoing excerpts were taken from an authentic copy of the record in the office of the attorney general, which is accessible to the court. This case can not be distinguished from the one at bar on the question of chance. The opinion of Judge McComas was quoted with approval by Judge Wellborn in *United States v. Fulkerson,* 74 Fed. Rep., 619, 629, and has, therefore, the sanction of two eminent jurists.

SEDGWICK, J.

This is an information in the nature of quo warranto to annul the corporate existence of defendant and oust it of its corporate powers, franchises and privileges. To the answer of the defendant the attorney general filed a general demurrer. The answer alleges that defendant has been and is entering into contracts with various parties in pursuance of its franchise. The terms of these contracts are set out in full in the answer. The principal questions presented and discussed by counsel are: First. Do these contracts contain the elements of a lottery? Second. Are they unlawful as against public policy? By the terms of the contract the company "agrees and undertakes to assist the said holder of this contract in purchasing and paying for a home." The holder agrees to pay $3 for the "com-

---

* 31 Wash. L. Rep.—Unofficial.

pany's services in registering and issuing each application and contract" and "to pay to the company, at the home office of the company, in Omaha, Nebraska, $1.35 each month, on or before the last day thereof, from the date hereof until this contract shall mature as hereinafter described." After the contract matures, the amount of the monthly payments is increased to $5.35, and continues "until the holder shall have paid into the home fund, as herein provided, the total sum of one thousand ($1,000) dollars, or such fractional part of said sum as shall be furnished for him by the company. Five dollars of said sum of $5.35, so paid, shall be placed by the company in the home fund, as hereinbefore described, and 35 cents thereof, is in payment for the services of the company." The contract also provides:

"First. Said company shall number and date all contracts issued in regular numerical order as applications are received at the home office. and shall keep a record thereof, showing the date and serial number of each contract.

"Sixth. This contract shall be deemed to be matured within the meaning hereof, when there shall be, over and above what is required to be paid out on contracts of lower serial number than this contract, either, first, an income of fifty ($50) dollars per month due said home fund from contract-holders; or second, an amount of money in said home fund which, when added to the income so due from contract-holders for a period of twenty months, will equal one thousand ($1,000) dollars.

"Seventh. When this contract matures, the company agrees on each and every month thereafter, for twenty months, to pay out of the said home fund the sum of fifty ($50) dollars, in assisting the holder to purchase a home, to pay off a mortgage on a home owned by the holder, or to erect a dwelling-house on a lot belonging to a holder, as said holder may prefer.

"It is understood and agreed that the holder shall select property of the value of one thousand ($1,000) dollars,

on the basis of said payments thereon of fifty dollars ($50) per month, and thereupon the company shall immediately proceed to investigate title and value of the property, and, as soon as possible, notify the holder of its approval or disapproval of the holder's selection.   *   *   *

"If the company approves the selection, it shall immediately cause the property selected to be purchased, and put the holder in possession thereof, on the terms and conditions hereinafter contained."

1. Does this scheme involve the elements of a lottery? To constitute a lottery, there must be a prize offered and the payment of something for a chance to obtain it. The attorney general has furnished the court with an "expert's table," which is derived from a computation based upon the issuing of contracts upon one thousand applications received at the same time, and each holder paying his instalments according to his agreement. We do not understand that defendant's attorneys deny the accuracy of the result obtained upon the basis assumed, and it appears that the twenty-two holders of the lowest numbered contracts would get their first instalments, respectively, within the first twenty-month period after the contracts were made, and would receive the full sum of $1,000 within the next twenty-month period thereafter; whereas the holder of contract numbered 1,000, although making his payments monthly, would not have any return from his investment until more than seventy years from the time he took his contract and began payment. The advantage of the fortunate holder of the early number is manifest. To obtain such a preference is to obtain something of value. "It is idle to say that a sum or an obligation for a sum due and payable to-day or at an early day is of no more value than an obligation for an equal amount, without interest, payable at a remote and indefinite time." *MacDonald* v. *United States,* 12 C. C. A., 339, 345. · The question, then, is whether the element of chance enters into the scheme by which one contract-holder obtains this advan-

---

* This name is spelled differently in different reports of this case.
—W. F. B.

tage over another. The contracts are to be numbered and dated "in regular numerical order as applications are received at the home office." The applicant must take his chances as to how many applications may be received at the same time that his is received and, if there are several at the same time, he must take the chance of preference over other applications received with his.

In *MacDonald v. United States, supra,* Judge Woods said (p. 344) : "Whether or not a purchaser will obtain a bond of one number or another depends * *. * upon the order in which his application shall reach the hand of the secretary, and that is largely a matter of chance. The secretary receives applications by mail and otherwise, sometimes singly and sometimes a number together, and in the order of receipt, and, as he chances to take up one or another first, passes them through a registering device, and in accordance with the notations thereby made upon the applications the bonds are numbered and issued. But for the purchaser's hope, or, as it may as well be said, for his chance, of getting a multiple number, the business would soon cease." He held that "the element of chance incident to the numbering of the bonds before they were issued" made the scheme a lottery.

The reasoning of the court in the *MacDonald Case* was adopted by Judge McComas in a similar case recently decided in the supreme court of the District of Columbia. *United States v. Sherwood.* * Judge McComas fortifies his conclusions by quotations from other authorities, and holds that under such a plan, "the number of the certificates, and their consequent value, depends upon chance." A certified copy of his very clear and satisfactory opinion is on file in this case. He says: "In different states, applicants, on the same day, may mail subscriptions for certificates in this company. Whether or not an applicant will receive a certificate of one number or another depends upon the order in which the applications may reach the officer of this company who issues the certificates, and that

---

* 31 Wash. L. Rep.—Unofficial.

is a matter of chance. This officer receives these applications by mail, or otherwise; it may be one at a time; it may be many at the same time; and, according to the order in which he chances to receive them, or as he chances to take up one or another, and determines the number of each applicant's certificate, the certificates are numbered and issued. He who by these chances luckily receives an earlier number, will be paid sooner, and will pay in less money than another, who, subscribing on the same day, receives a later number, and will by these chances be required to pay longer and pay more money, and wait longer for payment of his shares. It is this element of chance in the numbering of the certificates which I believe to be a violation of this anti-lottery law. It is evident that the inducement to subscribe consists mainly in the chance of securing an early or lucky number." This reasoning is satisfactory to our minds, and we have been referred to no authority conflicting with the views so announced. The suggestion that the applicant will know the number of his contract before he accepts it, and if not satisfied, may reject the contract, is without merit. By his application he agrees to accept the contract and he is presumed to know the terms of the contract before he makes the application. The suggestion is predicated upon the idea that he will not perform the agreement that he has made in his application, but will forfeit the fee "for registering and issuing each application and contract" and so risk only the three dollars. If that is the proper construction of the contract, the result is the same. It involves the payment of three dollars for the chance of obtaining an early number.

2. This defendant can not be allowed the protection of its charter to do business in this state for another reason. Its plan involves taking money from its patrons upon contracts which on its part it is impossible to perform. It professes to be a "home company," and it "agrees and undertakes to assist" the holders of its contracts "in purchasing and paying for a home." It issues contracts

which, through the misfortune of the holders in the numbering of the applications, will bring no assistance before the expiration of the ordinary allotment of three score years and ten. It can not result in assistance to such holders in procuring a home in this world, and it does not profess to render assistance in any other. If it is intended that there will be new patrons, whose monthly payments shall be used to make good the company's promise to holders of earlier contracts not otherwise provided for, the situation is still worse. The company can not furnish the funds to assist these new patrons to obtain homes before the time will come when, in the ordinary course of nature, they can not avail themselves of such assistance. Their own payments can not do so, nor help to do so. These are pledged to make up a deficiency existing before they obtained their contracts. They can hope to obtain the fruits of their contracts during their natural lives only from the payments to be made by others who obtain contracts after them, and there must be a sufficient number of these others in order to bring about the hoped-for result. It appears from the table referred to that about one-third of the holders of the first one thousand contracts supposed to be issued at one time would be able to procure homes within twenty-five years. To enable one thousand to do so, there must be three thousand contracts taken, or two thousand new patrons, who must take their contracts soon after the first thousand are taken. To enable these additional two thousand to obtain the promised assistance, there must be a still larger number of other contracts taken within a short time after the two thousand take theirs, and so on in progressional numbers, which must in a few years run into infinity. The contracts so contemplated can not, of course, all be fulfilled, and public policy will not permit the state to become a party to such a scheme.

The defendant's business is, for these reasons, unlawful.

The demurrer is sustained, and judgment of ouster will be entered as prayed.

JUDGMENT OF OUSTER.

Note.—The following is the contract referred to in the foregoing opinion:

"Serial No. ——.                                              $1,000

"NEBRASKA HOME COMPANY,
"(Incorporated)
"Of Omaha, Nebraska.

"This agreement, made and entered into by and between the Nebraska Home Company, of Omaha, Nebraska, a corporation duly organized under the laws of the state of Nebraska, party of the first part, and, for convenience, hereinafter referred to as the company, and ........................, party of the second part, hereinafter called the holder,

"Witnesseth: That for and in consideration of the covenants and agreements hereinafter contained, to be kept and performed by the said parties hereto, the said Nebraska Home Company hereby agrees and undertakes to assist the said holder of this contract in purchasing and paying for a home, and the said holder agrees to pay to said company the sums hereinafter provided for its services, all as stipulated herein. The terms and conditions of this agreement, which the parties hereto mutually promise and agree with each other to perform and do, are as follows, to-wit:

"*First.* Said company shall number and date all contracts issued in regular numerical order as applications are received at the home office and shall keep a record thereof, showing the date and serial number of each contract.

"*Second.* For said company's services in registering and issuing each application and contract, the holder agrees to pay said company the sum of three ($3.00) dollars.

"*Third.* The holder agrees to pay to the company, at the home office of the company in Omaha, Nebraska, one dollar and thirty-five cents ($1.35) each month, on or before the last day thereof, from the date hereof until this contract shall mature as hereinafter described.

"*Fourth.* The company shall deposit one ($1.00) dollar of each one dollar and thirty-five cents ($1.35) so paid, in some approved national bank, in the city of Omaha, in a fund to be known as the home fund, which fund shall be a trust fund held by said bank for the benefit of contract-holders, and said fund shall only be drawn from on the order of the board of directors, addressed to the president and treasurer, on checks signed by them, to be used as provided for in this contract. The said one dollar a month shall apply in the repayment of the amount furnished the holder under this contract.

"*Fifth.* The remaining thirty-five (35) cents of each one dollar and thirty-five ($1.35) cents, so paid, is in payment for the services rendered by the company.

"*Sixth.* This contract shall be deemed to be matured within the meaning hereof, when there shall be, over and above what is required to be paid out on contracts of lower serial number than this

contract, either, first, an income of fifty ($50.00) dollars per month due said home fund from contract holders; or second, an amount of money in said home fund which, when added to the income so due from contract-holders for a period of twenty months, will equal one thousand ($1,000.00) dollars.

"*Seventh.* When this contract matures, the company agrees on each and every month thereafter, for twenty months, to pay out of the said home fund the sum of fifty ($50.00) dollars, in assisting the holder to purchase a home, to pay off a mortgage on a home owned by the holder, or to erect a dwelling-house on a lot belonging to the holder, as said holder may prefer.

"It is understood and agreed that the holder shall select property of the value of one thousand ($1,000.00) dollars, on the basis of said payments thereon of fifty ($50.00) dollars per month, and thereupon the company shall immediately proceed to investigate title and value of property, and, as soon as possible, notify the holder of its approval or disapproval of the holder's selection.

"It is understood that the company reserves the right before paying any sum of money on any property selected, to satisfy itself that the property selected by the holder is of the value of said one thousand ($1,000.00) dollars, as aforesaid, and that the title thereof is perfect; and in case of the erection of a dwelling-house upon the property owned by the holder, that the company shall have the right to see that the holder's title to the lot is perfect, and that the money spent in the erection of the building is judiciously expended, so that the lot with the building so erected thereon shall be worth the sum of one thousand ($1,000.00) dollars, as aforesaid.

"The company shall have ninety days from the time that the holder notifies it of his selection, in which to make said investigations, and to complete the arrangements for the purchase thereof.

"If the company approves the selection, it shall immediately cause the property selected to be purchased, and put the holder in possession thereof, on the terms and conditions hereinafter contained.

"*Eighth.* The holder may, on the maturity of this contract, elect to take any fractional part of the said sum of one thousand ($1,-000.00) dollars, if he so desires.

"*Ninth.* At the time the company makes said advancements, the holder agrees, as security to the company for the faithful performance of this contract, and security that the holder will keep the property purchased in good repair, and insured in a suitable sum with an approved insurance company; and will not commit, or suffer to be committed, any waste upon said premises, and will promptly pay the taxes thereon before same become by law delinquent, and that he will faithfully make the payments herein required to be made by him, all of which the holder agrees to perform and do, that the holder shall give the company, or some bank, or trustee, to be named by the company, suitable security on the property purchased or improved, either by means of a lease from the owner to the said holder of this contract, a land contract, mortgage, or trust deed, or otherwise, as required by the company.

"Until the sum of two hundred and fifty ($250.00) dollars is paid into the home fund on this contract, the holder may only demand a lease of said premises, and until three hundred and fifty ($350.00) dollars is paid into the home fund on this contract the holder may only demand a land contract for said premises. Thereafter the security may be by mortgage, trust deed, or otherwise, as the company shall elect. In all cases of advancements to a contract-holder, the contract-holder must pay the sum of ten ($10.00) dollars to defray the expenses of drawing the necessary papers and for the examination of the title of the property. ,

"*Tenth*. It is one of the conditions of this contract, and shall be one of the conditions of said security, that if the holder shall fail to make his payments, as herein provided, after said advancements have been made to the holder, or shall commit any breach of the conditions of said security contract, then all the sums to be paid on this contract shall immediately become due and collectible.

"*Eleventh*. After maturity, as aforesaid, of this contract, the holder agrees to pay said company the sum of five dollars and thirty-five cents ($5.35), each month, on or before the last day thereof, from the time of maturity until the holder shall have paid into the home fund, as herein provided, the total sum of one thousand ($1,000.00) dollars, or such fractional part of said sum as shall be furnished for him by the company.

"Five ($5.00) dollars of said sum of five dollars and thirty-five cents ($5.35), so paid, shall be placed by the company in the home fund, as hereinbefore described, and shall apply in the repayment of the amount furnished for the holder of this contract, and shall be used to mature contracts.

"The remaining thirty-five (35) cents thereof is in payment for the services of the company; but the holder shall in no event be required to pay said thirty-five cents per month for a period exceeding two hundred (200) months from the date of this contract, or to exceed seventy ($70.00) dollars in all.

"*Twelfth*. The holder may make as many payments of five dollars and thirty-five cents ($5.35) each, as he may desire in advance of the time same are due, and at any time the holder desires to settle with the company in full he may do so by paying to the company the balance due the home fund, with one payment of thirty-five cents for the company's expenses.

"*Thirteenth*. If the holder hereof shall fail to make any payment within one calendar month from the time when the same becomes due and payable, and shall fail to have same extended on the terms and in the contingencies hereinafter mentioned, then the company shall sell this contract to some other person, and all the rights which the holder has hereunder shall be terminated and transferred to the purchaser; and to fully carry into effect this provision, the undersigned holder hereby appoints the secretary of the Nebraska Home Company, of Omaha, Nebraska, the holder's true and lawful attorney in fact irrevocably, with full power, for him and in his name and

place, to sell, assign, and transfer to the purchaser all the holder's rights, title and interest under this contract, for such sum as may be realized therefor. Said sale shall be made substantially as follows: Within ten days after the holder becomes in arrears for payment due and payable, the said secretary shall post in a conspicuous place in the home office of the company, a written or printed notice setting forth the name of the contract-holder, the date and number of this contract, the amount paid thereon, and the amount delinquent. Said notice shall be posted for at least twenty days prior to the sale, and shall state that the holder being in arrears, this contract will be sold to the highest bidder therefor, and that sealed bids therefor will be received by the company until the date set for the sale thereof and give the date of said sale, which date shall be the first day, not a Sunday or a holiday, of the next succeeding month. The company shall receive and file all bids made in accordance with said notice, and on the date appointed the secretary shall publicly open said bids, and award and sell said contract to the highest responsible bidder therefor. The amount received from said sale shall be applied in payment as follows: First, of all delinquent payments due the home fund; second, of all delinquent payments due the expense fund; third, a transfer fee of two ($2.00) dollars to the company. The balance shall be paid on demand to the holder whose contract is sold. On the payment by the purchaser of the amount of his bid, the company shall execute to him a receipt therefor, and within ten days thereafter, deliver to him this contract duly assigned; or if unable to obtain this contract with assignment from the original holder, the secretary as aforesaid, shall issue to the purchaser a new contract of even date, amount and serial number herewith, and this contract shall thereupon be and become null and void, and the holder of said new contract shall be subrogated to all the rights of the original holder.

"The holder expressly agrees that the company or any of its officers may make bids for this contract on the same terms and in the same manner as others.

"The company may, with the consent of the holder, reject any and all bids made and offer said contract for sale again as hereinbefore provided, the next succeeding month.

"Provided, That no sale shall be made by the secretary under this power of attorney while the holder is not in arrears for any payments due, nor for one calendar month thereafter.

"This contract shall not be construed to prevent the holder from selling this contract at any time before his rights hereunder are sold; by obtaining consent of the company and paying the transfer fee of two ($2.00) dollars, and all delinquent payments. Nor shall this power of attorney be construed to authorize the said secretary to sell or convey the holder's interest in any real estate purchased by him through the assistance of the company.

"*Fourteenth.* After the holder shall have come into possession of the property to be purchased for him under this contract, if he shall be

unable, by reason of sickness, or lack of employment, to make his monthly payment, when same becomes due, he may procure an extension of the time of said payment for one month by reporting the said cause of his delinquency to the secretary of the company during the calendar month immediately succeeding said delinquency. Said information shall be given under the oath of the party reporting the same. If such sickness, or disability, as aforesaid, shall continue, such extensions may be made from month to month, as aforesaid; but in no event shall the holder be allowed to have to exceed six payments so extended at one time. When such disability ceases, the holder shall make at least two payments each month until all such extended payments are paid in full.

"*Fifteenth.* If the holder desires assistance in a sum larger than one thousand ($1,000.00) dollars on any purchase, or on the erection of a home on a single piece of property, or the payment of a mortgage or mortgages on one piece of property, he shall procure same by taking out additional contracts with the company, and all contracts so taken out shall be applied for and regularly matured the same as new contracts. When two or more contracts are used for the purpose of procuring the company's assistance in the purchase of a single piece of property, the contract so used shall be and become merged into one contract, and thereupon the following words or words to that effect shall be indorsed by the secretary of the company, on all the contracts so merged, to-wit: 'This contract is merged with serial number ......,' and any breach of any condition of either of said contracts shall be a breach of the conditions of all said contracts so merged together. Nothing herein contained shall prevent the holder of this contract from taking out other contracts with this company and securing assistance in the purchase of property separate and distinct from the property purchased under this contract.

"*Sixteenth.* This contract may be assigned by the holder, and the said holder may be released from its obligations upon making assignment hereof to a satisfactory and reliable assignee, on the following terms: The holder shall pay to the company two ($2.00) dollars assignment fee, and shall procure the approval of the secretary of said assignment, which approval shall be indorsed thereupon. Said assignment shall be in writing, duly signed, witnessed, and acknowledged.

"*Seventeenth.* It is agreed that the total amount to be paid on this contract shall not exceed one thousand and seventy-three ($1,073.00) dollars, one thousand ($1,000.00) dollars of which is for the home fund, seventy ($70.00) dollars being thirty-five cents per month for two hundred months, and three ($3.00) dollars application and registration fees.

"*Eighteenth.* It is further understood and agreed that the covenants and agreements herein contained shall extend to and be binding upon the respective heirs, executors, administrators, legatees, devisees, successors and assigns of the parties hereto.

"*Nineteenth.* No officer or agent of this company has any authority to change or alter the conditions of this contract, or to make any other or different contract, or representations in regard thereto, than is contained herein.

"IN WITNESS WHEREOF, the Nebraska Home Company, has caused these presents to be signed by its president, and countersigned by its secretary, and sealed with the seal of said corporation, and the said holder has hereunto set his name, at Omaha, Nebraska, this —— day of 190—.

"NEBRASKA HOME COMPANY,
"By————————, *President.*

"(Contract-holder's signature) ————————.
   "Countersigned:
      "————————————,
                "*Secretary.*"

*Lottery.*—There is an excellent note on what constitutes a lottery in 12 C. C. A., pages 346 to 350, inclusive.—W. F. B.