STATE, EX REL. C. A. SORENSEN, ATTORNEY GENERAL, PLAINTIFF, V. AK-SAR-BEN EXPOSITION COMPANY, DEFENDANT.

FILED SEPTEMBER 26, 1929. NO. 27083.

. C. A. Sorensen, Attorney General, Irvin A. Stalmaster and E. B. Perry, for plaintiff.

*Mullen & Morrissey, Herman Aye* and *Gaines, McGilton, Van Orsdel & Gaines,* for defendant.

Heard before ROSE, DEAN, GOOD, THOMPSON and EBERLY, JJ.

ROSE, J.

This is a suit in equity brought originally in the supreme court by the state of Nebraska on the relation of the attorney general, plaintiff, for an injunction preventing the Ak-Sar-Ben Exposition Company, defendant, its agents, officers, servants and employees from conducting a game of chance, a lottery and an unlawful betting scheme by means of the *pari-mutuel* system, or otherwise, in connection with horse racing at the Ak-Sar-Ben race track in Omaha, Douglas county.

The petition, in substance, contains pleas that defendant, among other things, was incorporated to promote and conduct expositions, stock shows, fairs, horse races and other forms of public entertainment, without private gain, the races being under the supervision of the state racing commission; that defendant is advertising and unlawfully operating in Douglas county in connection with horse racing the game of chance and the gambling scheme known as the *"pari-mutuel"* system; that in so doing defendant has violated its charter and the Constitution and statutes of Nebraska and induced thousands of persons throughout the state to attend defendant's races and risk large amounts of money in betting and gambling, thus maintaining a public nuisance and causing the participants in those offenses to violate the law; that minors are permitted by defendant to engage in the betting and gambling and actually participate therein; that thousands of persons throughout the state who cannot afford it are induced and encouraged by defendant to play the game of chance involved in the *pari-mutuel* system operated by defendant and thereby lose large sums of money; that participation therein tends to demoralize the winners and to impoverish the losers; that indi-

vidual prosecutions would involve the state in a multiplic-ity of suits and would not prevent the lawlessness and nuisance described; that the state is without any adequate remedy at law. The *pari-mutuel* system operated by defendant is described in the petition as follows:

"That the said *pari-mutuel* system is an illegal and unlawful betting and gaming scheme, and by the said defendant used for that purpose, and in the use thereof, the said defendant receives money from patrons at its races, who pay the same to the defendant and the defendant receives said money in the purchase of tickets issued through said *pari-mutuel* machine designating specific horses taking part in such race meets, and the holder of such ticket receives after the conclusion of the race bet upon a sum of money evidenced by such ticket which depends entirely upon the result of such race between the horses entered in said race; that after issuing to the party purchasing such a ticket and registering the same, the defendant after the race, pays out an amount of money for said ticket to the purchaser thereof depending on the result of such race between the horses entered in said meet; that during the race meet now being conducted by the defendant, large amounts of money, the exact sum being at this time unknown to the plaintiff, have been bet, gambled, hazarded and lost as the result of the races between said horses carried on through the system of the *pari-mutuel* machine; that said *pari-mutuel* machine is a system of betting, wagering and gambling under which all of the money received by the defendant and bet upon the races as aforesaid is thrown into a common pool and is distributed at the conclusion of each race among the bettors backing the winning or victorious horse; that under said *pari-mutuel* system bettors purchase tickets at booths upon the premises of the defendant and elsewhere which tickets are registered not only as to the total number sold but also as to the total number sold on the particular race for which such ticket is issued; that under this system the bettors make the odds which vary according to the amount of money in the pool thus created and the number of tickets sold on

the winning horse; thus the greater the pool and the smaller the number of tickets sold on the winning horse, the larger are the winnings of the bettors; that all losses or winnings under said system are dependent wholly and· solely upon chance—outcome of the horses participating in said races and the number of persons betting on the winning horse."

The petition contains the further plea that the law under which defendant claims the right to conduct the *pari-mutuel* system of betting and gambling is embodied in the act of 1921 creating the state racing commission and containing the following provisions:

"Any association or corporation, person or persons, or the owners of the horses engaged in such races, or others may contribute to purses or funds that shall be distributed on the basis of the result of the races, or prizes or stakes that are to be contested for, subject to the rules and regulations as fixed by the commission governing such contests. The intent and purpose of this act is that all horse racing held in the state shall be subject to the rules, regulations and control of said state racing commission." Laws 1921, ch. 159, sec. 3; Comp. St. 1922, sec. 194.

The petition is positively verified. In addition there are two affidavits describing the practical operation of the *pari-mutuel* system as conducted by defendant and as pleaded by the state. One of the affiants stated in substance that, pursuant to invitation under the system, he purchased for $2 from an agent of defendant, on its premises, a ticket representing a race horse and received in return after the race $122.50, and that he saw several hundred people, among them young men and young women under 20 years of age, purchasing similar tickets.

On the petition and the additional showing outlined the state applied to the supreme court for a restraining order which was allowed June 10, 1929. Defendant and the state racing commission promptly attacked the restraining order by motions to dissolve it. These motions were argued in open court at great length June 17, 1929. Should they be sustained? This was the question for determination. ·· ·

The original jurisdiction of the supreme court is invoked by the state under the principle that a wrong arising out of repeated violations of a penal statute and harmfully affecting the rights and interests of the people generally throughout the state, when committed by a corporation engaged in public service, is a public wrong which may be enjoined by the supreme court in an original suit in equity, wherein the state is plaintiff. Const. art. V, sec. 2; *State v. Pacific Express Co.*, 80 Neb. 823; *State v. Adams Express Co.*, 85 Neb. 25; *State v. Chicago, B. & Q. R. Co.*, 88 Neb. 669.

At the hearing on the motions to dissolve the restraining order defendant did not deny the charge that it conducted the *pari-mutuel* system of betting at its races but on the merits of the controversy boldly advocated the propositions that it is authorized by statute to do so, and that there is no law of Nebraska to the contrary. The solution of the problems submitted requires an interpretation of the statute creating the state racing commission and the laws relating to lotteries and gambling.

The public policy of the state as declared by the people in constitutional and legislative provisions throws light on the purpose and meaning of statutes relating to lotteries and gambling. There was a time when lotteries were tolerated as a means of raising public revenue, and when they were conductd for private gain, but in Nebraska the demoralizing influence of those evils was deemed to be of such magnitude as to call for the following constitutional prohibition:

"The legislature shall not authorize any games of chance, lottery, or gift enterprise under a pretense, or for any purpose whatever." Const. art. III, sec. 24.

The statute relating to the same subject is in the following language:

"Whoever opens, sets on foot, carries on, promotes, makes or draws, publicly or privately, any lottery or scheme of chance, of any kind or description, by whatever name, style or title the same may be denominated or known; or by such ways and means exposes or sets to sale any house or houses,

lands or real estate, or any goods or chattels, cash or written evidences of debt, or certificates of claims or any thing or things of value whatever, shall be fined in any sum not exceeding five hundred dollars." Comp. St. 1922, sec. 9818.

Gambling is in the same category. It attracts young and old to places of idleness, where valuable time and fruits of honest endeavor are lost. It deprives legitimate industry of profitable service and lessens individual rewards therefor. The lure of profits that are out of all proportion to investment or service impairs the initiative essential to the highest development of ideal citizenship. It tends toward crime and increases the burdens of law enforcement—burdens that fall on the people generally throughout the state.

The legislature understood the evils and the public and private wrongs and injuries resulting from gambling and enacted laws to avert them. Statutes providing penalties are directed against playing at games; betting; gambling on private premises; gaming at public houses; gambling generally; keeping gambling fixtures; keeping gambling room; common gambler; enticing minors to gamble; keepers of public house or nine-pin alley; betting on elections; three-card monte; bucket-shops; gambling contracts. Comp. St. 1922, secs. 9799-9817.

In operating the *pari-mutuel* system in connection with the races is defendant amenable to the statutes against lotteries and gambling? It is argued that the statute creating the state racing commission authorizes the course pursued by defendant. That part of the statute authorizing contributions to funds to be distributed on the basis of the result of the races is pleaded in the petition and is as follows:

"Any association or corporation, person or persons, or the owners of the horses engaged in such races, or others may contribute to purses or funds that shall be distributed on the basis of the result of the races, or prizes or stakes that are to be contested for, subject to the rules and regulations as fixed by the commission governing such contests." Laws 1921, ch. 159, sec. 3; Comp. St. 1922, sec. 194.

Defendant's interpretation under the rules of the state

racing commission permits distributions of the fund in the pool to the winning holders of two-dollar tickets or certificates, less a percentage retained by defendant to pay prizes awarded to the owners of horses that win the races. In this connection it was stated in open court that the races could not be continued without the money so retained. Defendant's construction of the statute is untenable. Though distribution is authorized "on the basis of the result of the races, or prizes or stakes that are to be contested for," the statute does not say that funds in the pool shall be distributed among contributors who win bets on the races. So construed, the language used by the legislature would sanction the *pari-mutuel* system which, in practical operation, as hereinafter explained, is both a lottery and a method of gambling in public on an extensive scale. Such a purpose should not be imputed to the lawmakers by the construction of language not so providing. The better interpretation is that the funds to be raised and distributed for prizes or stakes are intended as rewards for the owners of horses that win and not for the winners of bets on the races. In this view the act is valid instead of unconstitutional, as it would be if the interpretation of defendant were adopted. The spirit and the purpose of the enactment, when considered as a whole, are at variance with lotteries and gambling. The purpose of the act is disclosed by the first section, which follows:

"That for the purpose of promoting the breeding of horses in the state of Nebraska, any association or corporation having for its purpose an improved breed of horses, or that is incorporated for the purpose of holding annual fairs or exhibits of agriculture and industrial products, and live stock, shall have the power and the right, subject to the provisions of this act, to hold one or more race meetings in each year, or to maintain and conduct trotting, running, pacing and walking races at such meetings." Comp. St. 1922, sec. 192.

The words "prizes" and "stakes," as they appear in the statute, were not used in the sense in which they are ele-

ments of lotteries and gaming. In the law creating the state racing commission they mean the prizes or awards honestly and lawfully won by exhibitors, contestants and owners of horses at fairs, expositions and stock shows generally. The legislature had in mind lawful methods of raising funds for legitimate prizes. A percentage of the proceeds of lotteries and gambling for unlawful purposes was not authorized. Horse racing, having been legalized in Nebraska, is not now of itself a game or gaming within the meaning of the laws relating to lotteries and gambling, as held by courts in many jurisdictions. The right of defendant to conduct the races themselves is not questioned by the state. The injunction sought is aimed at the *pari-mutuel* system in connection with the races.

It is the unanimous opinion that the statute upon which defendant relies does not authorize the *pari-mutuel* system or any other form of unlawful gaming, lottery or gambling.

Is the position that defendant is not violating any law of Nebraska well taken? The term *"pari-mutuel"* is rapidly acquiring a definite meaning in common parlance, in criminal law and in judicial opinions. It has been defined by lexicographers and law text-writers as a system of gambling, other names for the same thing being "French Pool" and "Paris Mutual." 27 C. J. 987, sec. 99, notes 13-15.

The *pari-mutuel* system operated by defendant, as disclosed by the petition of the state, was recently described in a notable case as follows:

"When a group of persons, each of whom has contributed money to a common fund and received a ticket or certificate representing such contribution, adopt a horse race, the result of which is uncertain, as a means of determining, by chance, which members of the group have won and which have lost upon a redivision of that fund, each contributor having selected a stated horse to win such race, the redeemable value of the certificates so obtained and held by the contributors to such fund being varied or affected by the result of such race, so that the value of some is enhanced, while that of others is reduced or destroyed, the

original purchase price of all having been the same, those who chose the winning horse being paid, from the fund so accumulated, more than they contributed thereto, by dividing amongst them the money contributed by those who chose losing horses and who therefore receive nothing, that process constitutes a 'game of chance;' and those who buy, sell, or redeem such certificates, for the purposes and in the manner stated, are 'engaged' in such game within the contemplation of sec. 5639, Rev. Gen. Stat. 1920. The acts just outlined also constitute 'gambling' as defined and prohibited by sec. 5514, Rev. Gen. Stat. 1920." *Pompano Horse Club v. State,* 93 Fla. 415, 52 A. L. R. 51.

A skillful annotator, commenting on that decision, said: "That the conducting of the sale of certificates under the *'pari-mutuel'* betting plan, as described therein, constituted engaging in a game of chance, and likewise gambling, is in accord with the weight of authority on this precise point."

The cases so holding are collected and analyzed in the annotation. *Pompano Horse Club v. State,* 52 A. L. R. 74, 75.

In the Constitution and statute the word "lottery" is used in its popular sense. A definition in the language of the law reads thus:

"Where not otherwise defined by statute the word 'lottery,' whether coming up for construction in a criminal prosecution or in a civil proceeding, cannot be regarded as having any technical legal signification different from the popular one, and it is, therefore, a species of gaming, which may be defined as a scheme for the distribution of prizes or things of value by lot or chance among persons who have paid, or agreed to pay, a valuable consideration for the chance to obtain a prize." 38 C. J. 286, and cases cited.

In *State v. Nebraska Home Co.,* 66 Neb. 349, a lottery was defined as follows:

"A scheme whereby a common fund is to be produced by the contributions of various parties, and afterwards distributed among the parties contributing thereto, and a valuable preference or privilege in the distribution thereof is made

to depend upon chance, is a lottery within the meaning of our statute prohibiting lotteries."

A machine or mechanical device for distribution of prizes, funds or property is not a necessary part of a criminal lottery and the prize may be anything of value. It need not be a definite amount of money. *State v. Nebraska Home Co.*, 66 Neb. 349. In *pari-mutuel* betting a loser pays for a ticket the same as the winners, but gets nothing from the pool to which he contributed, while the winners take the entire fund, less the percentage retained by defendant. The ticket serves no purpose as a means of admission to the race track. Discussing the element of chance in a lottery, Judge Wellborn once said:

"No man * * * would ever devise or promote a scheme whereby persons are invited to raise, by voluntary contributions, a fund solely for the purpose of redistribution among themselves, unless to each there was offered a chance of getting back something more than he contributed." *United States v. Fulkerson*, 74 Fed. 619, 628.

The supreme court of the United States quoted with approval the Century Dictionary's legal definition of lottery as follows:

"In law the term 'lottery' embraces all schemes for the distribution of prizes by chance, such as policy-playing, gift-exhibitions, prize-concerts, raffles at fairs, etc., and includes various forms of gambling." *Horner v. United States*, 147 U. S. 449, 458.

That a criminal lottery includes *pari-mutuel* gambling is shown by the constitutional and statutory provisions quoted as well as by the great weight of authority. *Pompano Horse Club v. State*, 93 Fla. 415, and cases collected by the annotator in a note following the report of that case in 52 A. L. R. 74.

The *pari-mutuel* system of betting and gambling on horse races, as operated by defendant and shown by the petition, contains every element of a criminal lottery—consideration, chance, price, means of disbursement. The contentions of defendant that there is in Nebraska no statute against

betting on horse races and that defendant is violating no law, are, therefore, wholly without merit. When betting and gambling are conducted in the form, substance and livery of a criminal lottery they are unlawful and those who conduct them are amenable to the statute forbidding and penalizing lotteries. Neither the legislature nor the state racing commission had power to authorize defendant to operate a lottery in the guise of betting and gambling, or in any other form.

Having reached the conclusion, after mature deliberation, that the *pari-mutuel* betting plan operated by defendant, as shown by the petition and by admissions in open court, is an unlawful lottery and a method of gambling, it is unnecessary, in ruling on the motions, to discuss the question as to whether defendant independently of the lottery statute, violated the laws relating to games and gaming, gambling and betting. For the same reason the charge that defendant maintains a nuisance is not now considered.

Defendant's counsel, with exceptional skill and vigor, presented the further point that the supreme court, though having jurisdiction, should vacate the restraining order herein and abate or dismiss this proceeding out of deference to the district court for Douglas county where a prior action involving the same questions is pending. A transcript of the proceedings in that case was received in evidence and it shows in connection with the record herein that Honorable James M. Fitzgerald, as a judge of the district court for Douglas county, granted a restraining order to prevent the attorney general of the state from interfering with defendant's method of raising money by means of the *pari-mutuel* system of betting on horse races. On the other hand it was earnestly contended that the district court did not have jurisdiction to restrain the attorney general. Under the circumstances it is deemed unnecessary to decide this point as an interlocutory matter.

Motions to vacate restraining order overruled and preliminary injunction allowed.

Note—See Lotteries, 38 C. J. 293 n. 72, 302 n. 88, 303 n.

91; 52 A. L. R. 74; 12 R. C. L. 721; R. C. L. Perm Supp. 3171.