LONGSTRETH *v.* COOK, SECRETARY ARKANSAS RACING COMMISSION.

4-8780                                                    220 S. W. 2d 433

Opinion delivered April 4, 1949.

*Dave E. Witt,* for appellant.

*Ike Murry, Attorney General* and *O. T. Ward,* for appellee.

*Otis Nixon, Warren E. Wood* and *Griffin Smith, Jr.,* for intervener.

FRANK G. SMITH, J. The question presented by this appeal is whether Act 46 of the Acts of 1935, p. 90, legalizing pari-mutuel betting on horse races violates § 14 of Art. 19 of the State Constitution and is void for that reason. This section of the Constitution reads as follows: "No lottery shall be authorized by this State, nor shall the sale of lottery tickets be allowed." This Act 46 of 1935 created the Arkansas Racing Commission, and, among other things, provided that the Commission shall promulgate rules and regulations for horse racing and for the issuance of permits to operate race tracks and licenses to hold racing meetings under the terms and conditions therein specified.

Section 14 of this Act reads in part as follows: "Any license under the provisions of this Act, conducting a horse racing meeting, may provide a place or places in the race meeting grounds or enclosure at which he, they or it may conduct and supervise the pari-mutuel or certificate system of wagering by patrons on the horse races conducted by such license at such meeting, and such pari-

mutuel or certificate method of wagering upon such horse races held at said race track, and within such race track, and at such horse racing meeting, shall not under any circumstances if conducted under the provisions of this Act, be held or construed to be unlawful, other statutes or parts of statutes of the State of Arkansas, to the contrary notwithstanding."

The Act is a lengthy and very comprehensive one, and contains specific directions for the exercise of the license which the Commission is authorized to issue. Since the passage of the Act in 1935, the Racing Commission has issued annually a permit or license to hold racing meetings under its provisions in the City of Hot Springs, and it is sought by this suit to restrain the Commission from renewing this license or permit.

The argument is made that the Act is violative of the State's public policy, and that it legalizes what would otherwise be an unlawful act. In this connection it may be said that an Act was initiated and submitted at the General Election held in 1944 to repeal this Act, which was defeated by a large majority. As to what shall be the State's public policy, it may be said that this is a question which the General Assembly may decide. Upon the authority of *Lewis' Sutherland Sta. Const.*, Vol. I, 136, we said: "As to whether a law is good or bad law, wise or unwise, is a question for the Legislature, and not for the Courts." *State v. Hurlock,* 185 Ark. 807, 49 S. W. 2d 611.

We may therefore consider only the question of the constitutionality of Act 46, and rules have been often announced by this and other Courts to guide the approach to that question. In the recent case of *Fugett* v. *State,* 208 Ark. 979, 188 S. W. 2d 641, we said: "The wisdom and propriety of statutory enactments are matters to be determined solely by the legislative branch of the government. Courts are not authorized to strike down a law enacted by the General Assembly unless it clearly appears that the law contravenes some provision of the constitution; and, in case of doubt as to the con-

stitutionality of a statute, the doubt must be resolved in favor of the validity of the law.''

Many of our cases are cited in support of the statement just quoted, to which an indefinite number from other jurisdictions could be added.

Unquestionably Act 46 has authorized and legalized and possibly given encouragement to a form of gambling, but the question here presented is whether it has done so by authorizing a lottery. If it does, the Act is unconstitutional, as the provisions of the Constitution hereinabove quoted denied the General Assembly the power to authorize a lottery. So the question for decision is whether Act 46 authorizes a lottery.

The State Commissioner of Revenues is made the Secretary of the Racing Commission, and in the discharge of the duties imposed upon him he visited the track where the races are held and explained in detail how the betting thereon is conducted, and there appears to be no question but that the betting is conducted in a manner authorized by the Act.

The Court below held that a lottery had not been authorized and was not being conducted and dismissed the suit, from which decree is this appeal. This finding was based upon the testimony of the Revenue Commissioner, which is undisputed and is to the following effect:

The permit was issued to the Oaklawn Jockey Club of Hot Springs. The American Totalizator Company, which is a separate corporation from the Oaklawn Jockey Club, has a contract with the club to set up the mechanical equipment for the purpose of issuing and selling tickets to persons wishing to bet through designated windows in what is called the pari-mutuel room. There are ticket sellers at each window who are employees of the Totalizator Company. Under the law, ten per cent. of the proceeds of the sale of these tickets goes to the Jockey Club and five per cent. to the State, and the Totalizator Company is paid out of the Jockey Club's part of these proceeds. The Totalizator Company owns the machines which are used in betting and they are not for sale. At

one window tickets are sold on horses to win, that is, to cross the finish barrier first. At another bets are made on a horse for a place, that is, to run second; and at another window, bets are made that a horse will show, that is, run third. At still another window bets are made which are said to be ''across the board'' or combinations, that is, that the horse bet on will finish first, second or third.

Bets are received at still another window called a Daily Double; that is, the bettor names the horse which will win the first race and another horse which will win the second race, and if the horses thus bet on win both the first and second races the person thus betting is said to have won the Daily Double. This pool is independent of all the other pools and relates only to the first and second races.

When a person wishes to purchase his ticket at a designated window the seller pushes a button similar to a cash register and the ticket at that time is printed by an individual machine designating the number of dollars paid for the ticket, and it is registered on an individual calculator which is there and is automatically transferred to what is called a master control totalizator. All of this takes place during the time the tickets are being sold for a particular race and they are sold before the beginning of that race. No tickets are sold in the second race until the first race has been run, with the exception of the Daily Double, nor on the third race until the second race has been run, and so on with the remaining races. Altogether eight races are run each day.

When a race is about to be run the machines are locked with a master key by the racing stewards who have a box in the stewards' stand and the betting windows are not reopened until a calculation is made of all the money that has gone through the individual machines and the totalizator has figured the amount of money in the Win, Show, and Place pools. From the total that has been placed in all the pools, fifteen per cent. is deducted, of which the Jockey Club gets ten per cent. and the State, five per cent.

The Jockey Club procures the horses that are to run at the racing meet, and there were about 1,200 of these during the preceding meeting. Some of these are not entered or run at any race during the meeting, but are kept there for training purposes. Others will run in more than one race during the meeting.

The owners bring their horses to the meeting and are accompanied by their trainers, who keep the horses in condition and accustom them to the tracks on which the races will be run. The horses are ridden by riders called jockeys, whose training, skill and ability are known to the owners who compete for the prizes offered in each race, and it is these prizes paid in money which compensate the owners for racing their horses. They receive no part of the money bet on the races. Admission fees to the race track are charged, but the owners of the horses have no share therein.

After the deduction of the fifteen per cent. above mentioned has been made the balance in each pool is paid to the holders of tickets bet on the horses in the respective pools. The bettors do not bet against each other. The Act makes it unlawful to do so. The bet is between the bettor and the Jockey Club or the Association.

Horses are selected for entrance in a particular race by the Association, and the horses' names are listed or lined up on a daily racing card, and there is sold a racing form which shows the weight carried by each horse and its handicap depending on the past performances of the horse in previous races at that or other tracks. This weight handicap is intended in some measure to equalize the speed of the horses, and the amount thereof depends upon the horse's record in prior races run within the preceding twelve months.

The owners have trainers who are skilled in handling horses with the purpose of increasing their speed and making them more responsive to the control of the jockeys.

Many persons attend the races for the thrill of witnessing the horses as they cross the finish line, and add

to the thrill and interest by betting on some horse without knowledge of the information disclosed by the form sheets. For instance, a lady might bet the minimum amount permissible on a horse having the same name as her kitchen range. But sources of information now are provided, as stated above, by which bettors may bet with more discrimination and with improved chances of selecting or picking a winner.

These form sheets designate whether upon previous performances a particular horse is a fair mud runner, a good mud runner, or a superior mud runner, which information is of value when the track upon which the races are to be run on the day of the issue of the form sheet is muddy.

Followers of racing who for long periods of time have studied the records of the horses choose as their selections the horse which in their opinion will be most likely to win and these are for sale and may be purchased at the track. Neither the Jockey Club nor anyone connected with it fixes the odds which will prevail on any horse. The bettors themselves do this and it is done through the number of bets made and the amount thereof on particular horses.

The animal equation enters into these races just as the human equation enters into sports between men and women. A horse may run better on one day than on another, depending on the condition of the horse, and it is the function of the trainer to see that the horses are in the best possible condition and properly trained. The element of chance necessarily enters into these races, but it is by no means controlling. Other elements of more importance are the condition and the power of endurance of the horse and the skill and daring of its rider. Some jockeys win more races and a higher percentage of the races in which they participate than others. The services of these jockeys are of course in greater demand by the horse owners who must win the races to obtain the money prizes for which they race.

Under the facts above stated, is the horse race a lottery conducted under the pari-mutuel system herein de-

scribed? It must be admitted that courts have differed in their conclusion, but an examination of many of these cases leads to the conclusion that the great weight of authority is that such races are not lotteries and we think the sounder reasoning supports that conclusion.

Lotteries are of ancient origin, some conducted for benevolent purposes and others solely for gambling. They became so common and their influence so pernicious that efforts were made to prohibit them. In every Constitution we have had the General Assembly has been denied the power to authorize their operation. They were singled out and not treated as other forms of gambling. Except as to lotteries, the Constitution left to the General Assembly the question of permitting, prohibiting or regulating gambling, and this long before the parimutuel system of conducting horse races had been thought of.

So the question remains for decision whether the betting which has been licensed under the provisions of Act 46 of 1935 is a lottery. The inhibitions of our Constitution against authorizing a lottery would not make that a lottery which was not so in fact.

The word lottery is derived from the word lot, one definition of which as given in Webster's New International Dictionary is: "An object used as one of the counters or checks in determining a question by the chancefall or choice of one or more of them; a sort. See Sortilege, Divination. In *drawing lots* each competitor may place his lot (marked) in a receptacle from which a disinterested person draws one, on the owner of which the chance falls; or, each competitor may draw one of a series of lots, the chance falling upon the person who draws one previously specified. In *casting lots,* the lots are placed by the competitors in a receptacle which is then shaken until one falls out, the chance falling on its owner."

. The word lottery is defined by the same authority as follows: "A scheme for the distribution of prizes by lot or chance; esp., a scheme by which one or more prizes are distributed by chance among persons who have paid

or promised a consideration for a chance to win them, usually as determined by the numbers on tickets as drawn from a lottery wheel.''

In our case of *Burks* v. *Harris,* 91 Ark. 205, 120 S. W. 979, 23 L. R. A., N. S. 626, 134 Am. St. Rep. 67, 18 Ann. Cas. 566, the following definition was given: ''A lottery is a species of gaming, which may be defined as a scheme for the distribution of prizes by chance among persons who have paid, or agreed to pay, a valuable consideration for the chance to obtain a prize.'' This definition was taken from 25 Cyc. 1635.

It appears therefore that to constitute a lottery it is essential not only that the element of chance is present, but also that it controls and determines the award of the prize whatever it may be.

In the chapter on *Gaming,* 12 R. C. L. 716, § 14, it is said: ''A game of chance is said to be such a game as is determined entirely or in part by lot or mere luck, and in which judgment, practice, skill and adroitness have honestly no office at all, or are thwarted by chance.'' It was there further said: ''The test of the character of the game is not whether it contained an element of chance or an element of skill, but which of these is the dominating element that determines the result of the game.'' In a note to the text just quoted the case of *People* v. *Lavin,* 179 N. Y. 164, 71 N. E. 753, is cited as having been annotated in 1 Ann. Cas. 165, 66 L. R. A. 601. See, also, 27 C. J. 968, Chapter *Gaming,* §§ 4, 5, 6 and 7, and 34 Am. Jur. Title *Lotteries,* § 6, p. 649.

The question whether betting on horse races in which the pari-mutuel system is employed is the subject of the annotation in 52 L. R. A. 51 and 85 A. L. R. 605. The briefs of opposing counsel in the case last cited collect other annotated cases from which it appears to have been more frequently held that the pari-mutuel system of wagering does not constitute a lottery. An opinion would be of interminable length which undertook to review all of them.

The annotated case in 85 A. L. R., *supra,* is that of *People* v. *Monroe,* 349 Ill. 270, 182 N. E. 439. In that

case, with one member of the Court dissenting upon a ground not stated, the Supreme Court of Illinois held that a statute not essentially different from our Act 46 had not authorized a lottery. In reaching the conclusion stated it was there said: "Every event in life and the fulfillment of every lawful contract entered into between parties is contingent to at least some slight extent upon chance. No one would contend, however, that a contract knowingly and understandingly entered into between two parties is a gaming contract merely because its fulfillment was prevented as the result of the befalling of unknown or unconsidered forces, or by the issue of uncertain conditions, or by the result of fortuity. The parimutuel system of betting does not come within the definitions given above. (In Webster's Dictionary, which we have hereinabove quoted.) While the amount of money to be divided is indefinite as to dollars and cents, it is definite in that the amount of money to be divided is the total stakes on the winning horse, less a given percentage to the management. The persons among whom the money is to be divided are not uncertain, as they are 'those who bet on the winning horse.' The winning horse is not determined by chance, alone, but the condition, speed, and endurance of the horse, aided by the skill and management of the rider or driver, enter into the result." As showing that a horse race is not a game of chance the Court pointed out that in such races the horses engaged in the race are subject to human guidance and management, and it may be added that whip and spur are used to incite the horses to put forth their best efforts to win.

The cases cited and relied upon as supporting the contention that a lottery has been authorized are *State v. Ak-Sar-Ben*, 118 Neb. 851, 226 N. W. 705, and *Pompano Horse Club v. Florida*, 93 Fla. 415, 111 So. 801, 52 A. L. R. 51.

The Nebraska opinion above cited, delivered in 1929, supports appellant's contention, but it may be said of it that this opinion led to the adoption of an amendment to the Constitution of that State, § 24, Art. III, which nullified the opinion. The Pompano case, *supra*,

did not involve the question of whether a horse race was dependent on chance or not, the issue there being whether betting on a horse race was prohibited by the Florida game statute. The Court held that it was and so we would hold if the question was merely whether it was gambling. The Florida Court said: ''The question before us is whether or not the betting, selling and redeeming of certificates in the manner and for the purpose stated constitutes gambling or a game of chance.'' The Court merely held that it was gambling, and so it is. So, also, is betting by the pari-mutuel system gambling, but it is not a lottery, and Act 46 provides that such betting shall not be unlawful.

The use of the pari-mutuel machine does not make the betting a lottery, if it is not otherwise so, as it makes no determination of what horses are winners. It is merely a wonderful machine which expedites calculations which could laboriously be made without its use. Its use in no manner affects the results of a race as it merely calculates the results of the betting after the races have been run and the respective winners announced.

We conclude, therefore, that while the element of chance no doubt enters into these races, it does not control them, and that there is therefore no lottery.

The decree so holding is affirmed.

This suit was originally filed by James MacKrell who did not prosecute an appeal from the decree, but one O. D. Longstreth, Jr., to save the appeal, filed an intervention in the court below alleging the same right to prosecute the suit which MacKrell had and prayed in the Court below an appeal and caused a transcript of the proceedings to be prepared, which he filed in this Court and his appeal was granted by the Clerk of this Court.

GRIFFIN SMITH, C. J. and ROBINS, J., dissent.

GEORGE ROSE SMITH, J., not participating.

ROBINS, J., dissenting. I respectfully dissent. I think we have no jurisdiction of this appeal for two reasons: In the first place, the lower court had no jurisdiction, and we can therefore acquire none on appeal. And,

in the second place, the appellant was not a party to the suit below; hence he had no right to appeal from the lower court's decree.

Inasmuch as I believe that we should dismiss the appeal for want of jurisdiction, it is unnecessary for me to express an opinion on whether the legislature has the constitutional power to enact a law which, in effect, makes every citizen of Arkansas a partner in a great gambling enterprise.

GRIFFIN SMITH, Chief Justice, dissenting. The basic grounds for this dissent—sustained, as I think, by mathematics, language of our Constitution, known practices, and admitted physical transactions—are fourfold: (1) The majority's mistake in concluding that the gambling contracts authorized by the Racing Act of 1935 are inter-party wagers, or mutual bets. (2) The term "pari-mutuel", as employed by the General Assembly, is a misnomer utilized to conceal an unlawful purpose. (3) The broader phrase *"pari-mutuel or certificate system of wagering by the patrons"* is employed to convey the erroneous belief that the transaction is carried out by mutual wagers or reciprocal bets between Jockey Club upon the one hand and ticket-purchasers on the other, although context of the Act conclusively shows that the system depends entirely upon lottery contracts—undertakings in which the management does not assume a semblance of risk, but on the contrary acts as money-holder in playing one patron against another—gathering an assured profit like the lotteries of 1874. (4) The system contains the vice that distinguished lotteries of 1874 from other forms of gambling: namely, the general sale of chances called tickets. This was a feature which gave the lottery operator the "extensive reach" that enabled promoters to draw all classes within the orbit of chance—rich, poor, skilled, unskilled, and all too often the trustees of funds belonging to another.

*First—Method of Operation.*—The only question is whether the character of gambling legalized by Act 46 constitutes a lottery, as claimed by Longstreth, or

84

whether the practices authorized are, in fact, mutual bettings, for "No lotteries shall be authorized by this State, nor shall the sale of lottery tickets be allowed". Constitution of 1874, Art. 19, § 14.

The enactment of 1935 authorizing horse race gambling avoids use of the term *lottery*, or *lottery tickets*. Instead of these words there is recognition of the "parimutuel or certificate system". Hence, it is essential that we determine what this system is; how—if at all—it differs from the mischief expressly condemned, and whether legislative alchemy in the form of rhetoric can legalize a practice singled out from all the rest and banned as a burden to the social structure.

Section Fourteen of the Act provides that "No other place or method of betting, pool-making, wagering, or gambling [other than the pari-mutuel or certificate system] shall be used or permitted by the licensee, nor shall [the authorized system] of wagering be conducted on any races except horse races at the race track where [the system] of wagering is licensed". On all moneys wagered the Racing Commission may authorize any licensee to retain "not to exceed ten percent and breaks" on the total of amounts wagered. Section Nineteen restricts gambling to such mechanical equipment as the Commission may adopt.

Uncontradicted testimony of one of appellant's witnesses is that the Oaklawn Jockey Club as licensee utilizes machines owned by American Totalizator Company. The Company is agent of the Jockey Club in the matter of installing and operating the equipment, and in selling tickets to patrons. All money received for tickets is put in pools designated "Win", "Place", and "Show", corresponding with tickets. Money bet on a first choice horse goes into the Win pool, that wagered on second choice goes into the Place pool, and a third choice goes to Show. From the total of each of these pools ten percent is deducted for the Jockey Club (hereafter spoken of as the Association) and five percent is taken for the State. This leaves eighty-five percent for return to the bettors.

The evidence shows these additional facts: Weights are sometimes placed upon horses as handicaps, or, as it is said, "to equalize their speed" in relation to other entries. This, of course, affects the chance to win. Through purchase of a certificate, a bettor selects the horse upon which he desires to wager money. Odds on the various horses are determined by the number of persons betting on each animal. There is no privity of contract between or among the bettors. On the contrary, all contracts affecting results are between the American Totalization Corporation as seller of the tickets and the person who buys them. The Association does not bet in any manner against patrons. In other words, all funds entering the several pools are supplied by patrons.

To gain a better perspective from which to analyze all circumstances with which the transactions are invested, it is well to go back to the situation in 1874. By putting one's self in the position occupied by men who framed the Constitution, we can more accurately gauge the purpose.

Suppose A offers to bet B two dollars against an equal sum that a designated horse will win a stipulated race. B accepts and places his money with C as stakeholder. A may either win or lose, and B is in the same position. Since each of the contracting parties has a chance to win, and takes the risk of loss, the engagement is termed a mutual bet or wager. See *Carlill* v. *Carboloc Smoke Ball Co.*, (1892) 2 Q. B. 484, 490. On App., (1893) 1 Q. B. 256; Street's Law of Gaming, pp. 53, 73, 212, note (o) (London, 1937); 38 C. J. S., p. 43; Halsbury's Laws of England, 15: 473, 2d ed.; *Stearnes* v. *State* (1858) 21 Tex. 692, 694; Am. & Eng. Enc. of Law, 2d ed., 14:669, 29:1082; *Ellesmere* v. *Wallace*, (1929) 2 Ch. 1, 49, 52, 54; *Harris et al.* v. *White*, (1880) 81 N. Y. 532, 539; *Thompson* v. *Williamson*, 67 N. J. Eq. 212, 218, 58 Atl. 602; 27 C. J. 974.

All gambling is carried on by means of contracts resulting from offer and acceptance, either express or implied. 38 C. J. S. 44. There must be at least two parties to each contract. The illustration of A's offer to

B, and B's acceptance, is that of a mutual bet or wager. The alternative depriving the transaction of mutuality enters the picture when one of the parties has what is sometimes spoken of as "a sure thing". Since he cannot lose, nothing has been risked. But the naked statement of this relationship destroys the quality of mutuality and negatives any thought of "bet", or "wager". Viewed from this standpoint, the adventure has degenerated into a device intended to draw careless or credulous persons into a scheme involving acceptance of a tainted offer.

For instance: A sets up a stratagem and contracts with B, but at the same time he makes a similar contract with C, then plays them against each other. A, holding the two contracts, has certainty for a background; while B or C will be less fortunate. Unlike A, each cannot win. Neither of the contracts is a mutual bet or wager, for, although B and C are pitted against each other in interest, there is no privity of contract, and they may be utter strangers. Obviously the mutual betting or mutual wagering contract wherein A and B each risks two dollars under an agreement with each other is fundamentally unlike the arrangement by which A fortifies himself against risk and passes the hazard to B and C.

Now suppose A sets up a table at a race track and accepts bets or wagers from all who choose to deal with him. He gives a tab to each patron and records by appropriate entry all of the contracts thus made, including the name of each horse, and the odds that are given. Thus A becomes a dealer in mutual bets or wagers. He fixes the odds for his own benefit, but he may win or lose on any contract. A is a bookmaker. Enc. Britt., 14th ed., 10:11; *People* v. *Laude,* 81 Misc. 256; 143 N. Y. S. 156; 27 C. J. 981.

*Second—Historical Background.*—The nature of the scheme called lottery in 1874 may now be examined. At that time the Missouri Lottery persisted, in spite of the Missouri Constitution of 1865. "Flexible Participation Lotteries," by Francis Emmett Williams, p. 8. The Literary Lottery in Kentucky was active. Asbury's

"Sucker's Progress," p. 84. To the south the Louisiana State Lottery was siphoning cash from Arkansas and other states, using the United States mails for convenience. These lotteries all operated under the same contract pattern. The offeror or operator would promulgate a plan for sale of a designated number of tickets at a fixed price. Cash receipts would be sufficient to pay prizes, pay all expenses, and leave a generous margin of profit. The operator merely sold chances in the scheme, assuming no risk of loss. There was privity of contract between operator and ticket holders, but between purchasers themselves privity was lacking.

Because bookmaking is of English origin, and is older than either the pari-mutuel or pool system, English courts have dealt with both. Since many of our laws came from England, it follows that importance attaches to what our overseas cousins learned concerning the two types of contracts here reviewed. A summary of excerpts from decisions, and comments by Howard A. Street—an eminent English lawyer-author—will prove helpful.[1]

At page 50 Mr. Street says: "A wagering contract —though a contract *at odds*—is a peculiarly English invention, and found its way into English law as a legal method of deciding disputes. But it came to be known as 'an English way of settling a controversy' without litigation. . . . In 1878 Cotton, L.J., said, 'The essence of gaming and wagering is that one party is to win and the other to lose upon a future event, which at the time of the contract is of an uncertain nature—that is to say, if the event turns out one way A will lose, but if it turns out the other way he will win.' "[2]

Perhaps the more generally accepted English law definition of wagering contract is the one laid down in

[1] An introduction to Street's Law of Gaming is: "The law of gaming is a jig-saw puzzle. The author's aim has been, shirking no difficulty, to find a rational explanation of it. To do this it was necessary for him to go back to the earliest statutes and decisions. He has read, and re-read every decision which he has cited—about 1,600, including Irish and Scottish."

[2] Street's citations are to *Thacker* v. *Hardy*, 4 Q. B. D. 685, 695; *Carlill* v. *The Carbolic Smoke Ball Co.*, (1892) 2 Q. B. 484, 490; on appeal, (1893) 1 Q. B. 256.

1892 by Hawkins, J., who said in part: "It is essential to a wagering contract that each party may under it either win or lose, whether he will win or lose being dependent on the issue of the event, and therefore, remaining uncertain until that issue is known. If either of the parties may win but cannot lose, or may lose but cannot win, it is not a wagering contract."

Pools, totalizators, and coupon competitions were unknown in 1853; but, says Street, p. 69, "Distribution without loss to the distributor is an element common to sweepstakes, pool, some coupon competitions, and totalizators, and the same principle [eliminating possibility of loss to the distributor] must or should apply to all. . . . No [automatic] machine (p. 87) can be an instrument of [mutual] betting, unless it involves risk of loss to the owner and to the players. . . . Transactions with a totalizator do not in England (p.88) involve betting between the machine and contributors. . . . It may be said that the two most essential features of a totalizator are (1) that no loss or gain is involved to the machine, [and] (2) 'that the odds are determined on the conclusion of the betting by the total amount of money staked on the several horses by the backers' "[3]

Where §15 of the Finance Act of 1926 (16-17 Geo. 5, c. 22) imposed a duty on all bets with bookmakers, it was held that the Luncheon and Sports Club, [as to its ownership and operation of a totalizator] was not subject to the duty because the Club could neither win nor lose. This italicized proposition is stated by Mr. Street: "The relation of 'pool' to betting is not distinguishable from that of totalizators, . . . [and] it is submitted that 'pool betting' is no more clearly a type of betting than 'water polo' is a type of polo, and that the phrase is misleading. It was restricted by a section of the 1934 statute (24-25 Geo. 5, c. 58, s. 3 (1), (2). . . . A sidenote suggests that it is a species of pari-mutuel transaction. Its character is, however, a matter of common knowledge, and it is probably correct to say that it differs from a totalizator only in that a human agent takes

---

[3] Per Hanworth, M.R., in Att'y-Gen. v. Racecourse Betting Control Board, (1935) 1 Ch. 34, 52.

the part of the machine. It is superfluous to add that the term has no connection with the game of 'pool' nor with the 'pool' or 'jackpot' formed by successive contributions, as in many card games. It follows from what has been said as to totalizators that entrants to a pool do not bet with the organizer''.

*Third — Lotteries and Bookmaking.* — Having seen some of the basic differences between a mutual bet, mutual wager, or betting contract, on the one hand, and the contract in pools, totalizators, some coupon competitions, and sweepstakes or other lottery schemes on the other, it is in order to note the time and the circumstances under which the lottery contract came into use as a medium for race track gambling in competition with bookmaking.

It is true that one writer in the Encyclopedia Britannica places the origin of pari-mutuel gambling at Paris, France, in 1872. (14th Ed. 22:314). However, another writer in the same work tells us the system was in use at all the race courses in France in 1866 (Enc. Brit. 10:11). In ''Thoroughbred Racing and Breeding,'' a prominent sports writer fixes 1865 as the beginning of this type of race gambling. Furthermore, in *Tollett* v. *Thomas*, an English case decided in 1871 (L.R. 6 Q.B. 514), a machine for recording bets on races was involved. (See Street's Law of Gaming, pp. 88, 89, 205, 245). The court called it a totalizator, although it was a small and crude contrivance that a man could carry. From these authorities it would appear that 1865 is an approximately correct date for the beginning of a system from which have sprung the many variations known as ''pari-mutuels,'' ''pool selling,'' ''French pool,'' ''combination pools'', etc.

If this be the true date, then it may be said that in 1865 Pierre Oller, keeper of a perfume shop in Paris, installed in an open shed, a table, a record book, and blocks of tickets for the coming horse race. Pierre had a grudge against bookmakers. He thought they swindled customers on required odds. His idea burgeoned something like this: ''Why not give the suckers a better deal

on odds? Why shouldn't. I take for myself a percentage of all money received and award the balance to the backers of the winning horse?" This was the gist of Pierre's plan and the principle upon which all "parimutuel" gambling operates. (See Thoroughbred Racing and Breeding, p. 185. Enc. Brit. 22:314. 38 C.J.S. 47).

This horse gambling method was unlike mutual betting in bookmaking. Pierre made no mutual bets or wagers. He simply sold chances in a scheme. His contracts were half bets—that is, a win-or-lose relationship for acceptors at their end as in a lottery, and a sure thing for Pierre at the other, as in a typical lottery. Patrons were pitted against each other; but there was no privity of contract between or among them. Pierre was neither bettor nor trustee. See Wise .v. Ass'n (Del.), 45 A. 2d 547). His patrons had no equitable interest in the stakes he received. He was not a real stakeholder. If he sold a thousand tickets on a dozen different horses, the system merely involved that many agreements—common, ordinary contracts under which Pierre would operate a certain gambling plan tied to the results of a certain race.

France had known many lotteries in government finance and in religious and charitable enterprises, but her parliaments frequently protested their use. Great men like Turgot, Condillac and the Bishop of Antun had denounced them. And although lotteries for charity and the fine arts had been authorized in 1844, the Royal Lottery had been discontinued in 1836, ten years after government lotteries ended in England. (Enc. Brit. [9th ed.] 15:11).

By reason of this situation in France, and because England in 1826 had suppressed her crown lotteries, (while a strong anti-lottery wave swept the United States between 1820 and 1860), it was hardly advisable for Pierre Oller or his associates to permit any suggestion of lottery contracts or lottery tickets to be linked with his scheme. At any rate Oller et als referred to his system as "bookmaking." One sales contract was a *pare mutuel,* the French term for a mutual bet or mutual wager.

The plural, *paris mutuels,* meant mutual bets or mutual wagers. (See "pare mutuel" in any good dictionary.) From that day to this, beginning with Pierre Oller, seekers of easy money have been operating race lotteries in the guise and nomenclature of the bookmakers' mutual betting system.

The history of Oller's scheme in the United States will be better understood in the light of certain known facts. At the time the scheme originated, race track gambling was in the hands of the bookmakers who looked upon Oller with disfavor. Speaking generally, the scheme has made two invasions of this country: first in the 19th century—chiefly as a pool-selling system in gambling houses away from the tracks; and secondly, in the present century—as a system for gambling at the tracks through the medium of modern machines. The second invasion was more successful than the first, due largely to machines which have contributed speed and accuracy and a "color" of computative honesty, and to the backing of wealthy gambling promoters. Although all variations of Oller's plan are operated with lottery contracts, there remains this question: Accepting the universally-conceded proposition that a combination of prize, chance, and consideration constitutes a lottery, must the element of chance be restricted here to those forms of conventional uncertainty that were familiar to the constitution makers in 1874? In short, "Is the element of chance a matter of form rather than substantial fact?"

The first pool controversy appearing in the reports is the English case of *Tollett et al.* v. *Thomas* (1871), L.R. 6 Q.B. 514, where a small hand machine operated with keys and cranks automatically exhibited the total stakes on each horse and the grand total upon the registration of each individual stake. In *Commonwealth* v. *Simonds,* decided in 1881, (79 Ky. 618) a similar machine known as "French Pool" or "Paris-Mutuel" was in evidence. These contrivances were slow and crude, and added little to the progress or popularity of the Oller system.

In 1877, or just before that time, William Lovell tested the pooling system in New Jersey with *auction, French,* and *combination* pools. He took a ''cut'' of all stakes and handled prize money on the Oller plan. State v. Lovell, (1877) 39 N. J. Law, 458. In its opinion the court declined to restrict the meaning of ''lottery'' to conventional pure chance determinants, and pointed to some of the unpredictable uncertainties of a horse race, saying: ''The physical condition of the horse and his rider, the fastenings of his shoes, the honesty of purpose that actuates his rider and his owner in running him, the state of the weather and the track, and these circumstances in the case of every horse that races against him, are all matters about which the judgment of the outside bettor can avail him no more than the arithmetical calculation of chances can avail the dice thrower.'' (1 c.p. 462)

*Fourth*—''*Chance*'' *as a Determinant.*—To these recited uncertainties the court added another quotient that is unpredictable to all players except perhaps the last (assuming that only one player comes in at the last moment). It is the element of chance which determines *what* the winner is to gain. In auction pool this depends on *how much* others have played against him. In the other pools it depends on how *much* others play against him, and *how many others* play as he does. ''None of the bettors,'' said the court, ''save the last one, can possibly learn these matters.'' (1.c.p. 462). The court held that *chance,* not *skill,* controlled results of the horse race, and it affirmed defendant's conviction for conducting a lottery.

In 1881 Kentucky had two cases which should be noted, as they indicate the presence of pool-selling there at that time. In *Commonwealth* v. *Simonds* (79 Ky. 618, 620) there was involved a small hand machine called a *French Pool* or *Pari-Mutuel.* The Supreme Court treated the machine as a contrivance used in betting because the ticket-buyers could either win or lose; but it held that the operator of the machine was not guilty of gaming or betting, since he hazarded nothing. In other words, he

assumed no risk of loss in his contracts with the ticket-buyers.

In *Cheek* v. *Commonwealth,* 79 Ky. 359, the defendant's conviction for operating a disorderly house where pool-selling was conducted, was affirmed. At that time there was no statute against pool-selling; but the court declared that pool-selling *per se* was not a bet, or game of chance: reason:—the seller ran no risk. In its reasoning in these cases, the court was unconsciously making some of the distinctions between mutual betting contracts and lottery contracts.

In 1883 Michigan had a Constitutional prohibition against certain forms of gambling that had been adopted in 1835—a low penalty law against pool-selling, and a high penalty law against lotteries. In that year the Michigan Supreme Court reviewed two cases involving *French, auction,* and *combination* pools. The room where the scheme was consummated was declared a gambling resort. In *People* v. *Wiethoff,* 51 Mich. 203; 16 N. W. 442, 47 Am. St. Rep. 557, a conviction for pool-selling was affirmed in an opinion by Cooley, J. In *People* v. *Reilly,* 50 Mich. 384; 15 N. W. 520, 41 Am. St. Rep. 47, the defendant stood convicted of running a lottery. This case was reversed, not because pool-selling did not contain all the elements of a lottery, but because Campbell, J. thought Reilly's pool-selling did not have the "extensive reach" of the gambling enterprises of 1835 that were known as lotteries. In short, the prosecution was brought under the high penalty statute when it should have been under the low penalty law.

In 1887 the pool-selling movement scored a great victory when it got to the New York tracks under the authority of the famous "Ives Pool Act," (1887) N. Y. Laws, Chapter 479. It flourished without question for seven years, or until 1894, when three cases were decided by the New York courts. In *Irving* v. *Britton,* 8 Misc. 201; 28 N.Y.S. 529, the Act was declared a violation of the anti-lottery clause of the New York Constitution. In describing the Act in a scholarly discussion, Pryor, J., said in part: ". . . The process set forth is in

every essential a lottery. . . . It is a scheme for the distribution of property by chance . . . That the event of a race is a contingency dependent upon chance is a self-evident proposition. . . Not by principle only but by authority as well, we are sustained in the conclusion that pool-selling is a lottery . . ." (l.c.p. 531)

In the same month one of the Supreme Courts of New York (*Reilly* v. *Gray,* 77 Hun. 402, 28 N.Y.S. 811) took a contrary view. In the third case, *Ludington* v. *Dudley,* 9 Misc. 700, 30 N.Y.S. 221, the court mentioned *Reilly* v. *Gray,* but followed *Irving* v. *Britton.* The reasoning in the *Irving-Britton* decision was a severe blow to pool-selling in New York.

Appellees in their brief devote two pages to *Reilly* v. *Gray* in an attempt to bolster the contention that *pari-mutuel* betting does not violate an anti-lottery provision in a constitution. The logical answer to this appears to be that if *Reilly* v. *Gray* had been recognized as dependable law in New York the promoters of this form of gambling would not have gone to the trouble and expense of securing an amendment specifically exempting the pari-mutuels from the anti-lottery provision in the state constitution. (Amendment adopted November 7, 1939, effective January 1, 1940).

*Fifth—Some of the Decisions.*—Two pages of appellees' brief deal with another New York case, *People ex rel.* v. *Fallon* (1897), 152 N. Y. 12, 46 N. E. 296, 57 Am. St. Rep. 492, 37 L. R. A. 227. Their assertion is that it was a test "as to whether betting on horse races constituted a lottery." But they have followed dicta and misapplied the Fallon holding. Abbott's Consolidated New York Digest, Volume 23 at page 561, summarizes the decision as follows: "A racing association permitted owners of horses to compete for a purse to be furnished by the association. Each person who entered a horse was required to pay an entrance fee, which became the property of the association. The purse was contributed by the association, without reference to the entrance money. *Held,* that the transaction was not within Pen. Code, tit.

10, c. 8, forbidding lotteries.'' Obviously this Fallon case was not, as Appellees contend, ''a test as to whether betting on horse races constituted a lottery.''

In 1888 John Boyland of Baltimore sold tickets which bore the heading, ''Horse Combination.'' They were endorsed, ''Decided to be legal by the highest tribunal in the State of Maryland.'' Boyland was indicted in three separate counts charged with unlawfully selling a lottery ticket to one Maria Clagett, unlawfully keeping a room for the purpose of selling lottery tickets, and knowingly permitting a room of which he was the owner to be used as a place for selling lottery tickets.

Boyland's defense was that he was betting on horse races and not vending lottery tickets. In affirming a conviction the Court of Appeals of Maryland said: ''The real and only question presented to us, is whether the appellant can legalize an illegal act by calling it by another name, and that all the courts of justice in the land are bound to regard the act itself what he may chance to *call it*. If such be the law the Courts of criminal jurisdiction may as well be closed. The heading and endorsement on these tickets were a patent effort to evade the law against selling lottery tickets, the tickets were clearly admissible in evidence, and the jury had the undoubted right, disregarding the name and endorsement printed on them by the appellant, to find them what they really were, lottery tickets and not what they professed to be, tickets upon a horse combination.'' (*Boyland* v. *State,* 69 Md. 511, 16 Atl. 132).

At the time this case was decided the Maryland Constitution of 1867, Article 3, Section 36, contained this language. ''No lottery grant shall ever hereafter be authorized by the General Assembly''. This clause, and the decision in *Boyland* v. *State,* presented such obstacles to the so-called *pari-mutuel* system of race track gambling that the promoters of the scheme backed a constitutional amendment to insure legality. (Amendment proposed in 1935 and submitted to voters in 1938.)

The twentieth century has been productive of nine or ten cases that are cited in connection with a controversy of this kind. Only about half have direct bearing on the issues here.

In *Utah* v. *Green* (1926), 68 Utah 251, 249 Pac. 1016, the question was whether the Horse Racing Act of 1926 (which purported to authorize "pari-mutuel betting") was in conflict with Article 6, section 28, Constitution of 1895, prohibiting "any lottery" and "any game of chance." Evidence showed that this section had been blocked in the Constitutional convention until objectors were assured that it was not designed to interfere with betting on horse races. The Court agreed to this predetermined exemption, as such.

In Pompano Horse Club v. State ex rel. (1927), 93 Fla. 415; 111 S. 801, 52 A. L. R. 51, suit was under statutes against gambling and games of chance. It was sought to restrain and abate a *pari-mutuel* system operated in connection with horse races and under the same management. The matter of lottery was not raised. The Court held that, regardless of whether the race itself is called "a game of skill" or "a game of chance," the *pari-mutuel* process which uses the result of a race as a determinant, is gambling and constitutes a game of chance. This decision is in accord with the weight of authority. See 52 A.L.R. annotation, 1.c. 74.

In Nebraska in 1929, Article 3, section 24 of the Constitution of 1875, barred lotteries, and statutes prohibited lotteries and games of chance. There was a proceeding to restrain the *pari-mutuel* system of gambling at an Omaha track. The Supreme Court held that the Constitution and statutes use the word lottery in its popular sense; that the system attached contains the elements of prize, chance, and consideration, and that in operation it was a game of chance—a criminal lottery. State v. Ak-Sar-Ben Exposition Co., 118 Neb. 851; 226 N. W. 705.

In 1931 an important case came before the high court of Kentucky (Commonwealth v. Kentucky Jockey Club, 238 Ky. 739, 38 S. W. 2nd 987). It was initiated by

Attorney General Cammack, who challenged *pari-mutuels* as lotteries under an anti-lottery clause of the Constitution of 1870. It was shown that when the Colonels of Kentucky had this clause of the Constitution under consideration, there was a gentlemen's agreement that it should never interfere with their right to put money on the ponies at the tracks. This convention-construction of negative intent was upheld by the Court of Appeals.

Illinois furnished a case for 1932. The Constitution of 1870, Article 4, Section 27, prohibited authorization of lotteries. A legislative Act of 1927 approved the *pari-mutuel* or *certificate* system of wagering at race tracks. In People v. Monroe (1932), 349 Ill. 270, 85 A. L. R. 605, 182 N.E. 439, the Supreme Court in a test case held that in such a system the chance is not pure and the system was not a lottery. In the case at bar the majority quotes from the Monroe opinion in which the Illinois tribunal attempts to deny some unguessable uncertainties of the *pari-mutuel* system, saying: "While the amount of money to be divided is indefinite as to dollars and cents, it is definite in that the amount of money to be divided is the total stakes on the winning horse, less a percentage to the management. The persons among whom the money is to be divided are not uncertain, as they are 'those who bet on the winning horse' ". 182 N.E. 1.c. 442.

*Sixth—Judicial Ingraftation.*—It is to be seen that the amount of money to be divided is *uncertain,* but that the *manner* in which it is divided is *certain;* that the persons among whom the money is to be divided are *uncertain,* but that the *manner* in which it is to be divided among "those who bet on the winning horse" is *certain.* This appears to be a judicial process of ingraftation or consolidation, wherein chance-certainty is crossed with uncertainty for the theoretical elimination of wager casualty.

In 1935 the case of *Panas v. Texas B. & R. Ass'n,* 80 S.W. 2nd 1020, was before the Court of Civil Appeals at Galveston. Two years previously the Legislature had passed an Act purporting to legalize a *certificate* sys-

tem of gambling at the tracks. When a citizen sued to enjoin operation on the ground that the Act violated the anti-lottery section in the Constitution of 1870, and the gaming statutes, the Court held that lotteries and betting on horse races, being under separate statutes, were not "games" within the purview of the gaming statutes and that the citizen could not sue because no *"gambling house"* was involved. The Court brushed off the Constitutional question with the suggestion that since the Legislature did not consider the "system" a lottery it was not a lottery. This method of handling a constitutional question is not entirely new. It reflects a willingness by Judges to follow non-resistant lines, and is a species of official abnegation of responsibility not likely to appeal to unselfish citizens.

In 1939 *Engle* v. *State* was decided in Arizona (53 Ariz. 458, 90 Pac. 2nd 988). The State did not have a constitutional mandate against lotteries; but the Code of 1928 contained a public nuisance provision in connection with each of the specific offenses of lotteries, banking games, games of chance, and disorderly houses. In addition, there was a general public nuisance statute. The defendants ran a house in which they met all comers with mutual wagers on horse races outside of Arizona, at "odds" cast up by the pari-mutuel machines wherever such machines were in operation. Convicted of maintaining a nuisance under the general statute, the defendants on appeal insisted that their conduct should have been tied to one of the *specific* statutes. The Supreme Court affirmed the conviction. It was shown that the Arizona violations involved bookmaking contracts, although based on totals cast up by out-of-state machines. In discussing lotteries the court adopted the *dominant chance doctrine* and *not* the *pure chance* doctrine. Although this case was inadvertently cited by the Supreme Court of Michigan, *Rohan et ux.* v. *Detroit Racing Ass'n, et al.* (1946) 314 Mich. 326, 22 N.W. 2nd 433, 166 A. L. R. 1246, as sustaining the *pure chance* doctrine, it does not afford such support.

In 1946 the Supreme Court of Michigan in the *Rohan* case, *supra,* held squarely that the *pari-mutuel*

system of gambling on horse races was not a lottery within the meaning of the Constitutional provision of 1835. Judge Francis Emmett Williams of St. Louis, who has written much on the subject of lotteries, and in respect of whose highly analytical publications and finely expressed conclusions the writer of this opinion acknowledges an indebtedness, criticises the opinion in that in the course of years the Court had frequently placed the lottery tag on schemes that were unknown in 1835 or had departed from the conventional lottery pattern of that day, including a deviation from the pure chance doctrine itself. Judge Williams thinks the Court ignored rules of construction it had previously adopted in lottery cases. (See "The Lawyer and Law Notes," Fall Issue, 1946, p. 12). Judge Williams commends the trial judge who found that *pari-mutuel* gambling was the equivalent of the mass gambling aimed at by the Constitution; that under the scheme players must guess at unpredictable uncertainties, so that financial return upon the winning horse is entirely beyond the power of any individual to fix—a matter of the purest chance; that the gambling system is inconsistent with the state's public policy; that it is hypocritical and illogical, and that neither the Courts nor the Legislature had a right to put the State into the immoral business of gambling.

The opinion in the Michigan case assumes and argues that the "skill and judgment of the patrons" in the selection of horses is sufficient to take *pari-mutuel* out of the lottery class. If this be true, the question might be asked, Why is it that no patron is ever able to exercise enough "skill and judgment" to make a success of playing the races? Why the saying, "You may sometimes win a race, but you cannot beat the races?" Paul Gallico was not far wrong when he said, "There are only a few ways to win a race, but there are 87 ways to lose." As a matter of fact, whatever skill there is in this form of gambling is only a thin veneer to mislead Legislatures and Courts. The overwhelming majority of those who are induced to patronize pari-mutuels make their selections as in a guessing game.

In a guessing gamble of a slightly different type the Supreme Court of Missouri, all concurring, held that since hope of winning was held out to the general public, whether *chance* or *skill* is the determining factor in the competition must depend upon the capacity of the general public—not experts—to solve the problems presented. *State ex. inf.* v. *Publishing Company*, 341 Mo. 862, 110 S. W. 2nd 705; 710, 717. See also, Donaldson v. Magazine, 68 S. Ct. 591.

In the latest case on the subject (1947), Opinion of the Justices, 31 So. 2nd, 753, 249 Ala. 516, the decision of a majority of the Alabama Supreme Court upheld the Alabama Constitution against pari-mutuels. The syllabus in the Southern Reporter reads as follows: "A proposed act, providing for pari-mutuel and bookmaking methods of wagering on horse and dog races, violates the constitutional prohibition of 'lotteries or schemes in nature thereof', as amount recovered by one betting on winning horse or dog is *purely matter of chance*. (Emphasis supplied).

*Seventh—Thin Veneer of Skill and Judgment.*—In an article in "The Lawyer and Law Notes" heretofore referred to, Judge Francis Emmett Williams reviews the pure chance doctrine in English and American cases and comes to the conclusion that it has been practically abandoned in England and that it survives in this country only in some of these *pari-mutuel* cases. This conclusion seems logical; for why should lotteries, in substance and in fact, be permitted to evade the law simply because they have been veneered with a film of skill and judgment?—a veneer so frequently punctured that its utility proves nothing that can by any stretch of the imagination lend dignity to the position of a State where strained construction perpetuates the public in a partnership with ungovernable greed.

But let us again advert to the lotteries of earlier days. The Constitution singled them out from other forms of gambling. Why? The answer must be "because of their nature". The Supreme Court of Michigan distinguished them by their "extensive reach". *People* v.

*Wiethoff* (1883), 51 Mich. 203, 16 N. W. 442, 446, 47 Am. Rep. 557. The Supreme Court of the United States referred to them as "a widespread pestilence [that] "infests the whole community, . . . enters every dwelling, . . . reaches every class, . . . preys upon the hard earnings of the poor, . . . [and] plunders the ignorant and simple." *Phalen* v. *Virginia,* 8 How. (U. S.) 163, 168, 12 Law Ed. 1030, 1033.

In its "extensive reach", and its "appeal to every class", the lottery system has prospered through public contributions because of the facility with which it functions—the use of tickets. Tickets were the earmark of appeal that set the lotteries of 1874 apart from mutual betting at the races, and in respect of other forms of gambling. That the framers of our Constitution had these things in mind when they inveighed against lotteries is made certain by their prohibition against the sale of lottery tickets. In the early days large numbers of lottery tickets would be printed and sent by mail to agents who sold them. This made it unnecessary for the ticket-holder to be present at the *drawing*.

The proponents of today's lotteries have their printing presses operating on the ground. With lightning rapidity the complicated mathematical computations are made. More tickets are sold at Oaklawn in a single afternoon than were disposed of in a week for the lotteries prior to 1874. The use of tickets as "chances" facilitates mass gambling on a scale of such magnitude that the State itself boasts of the easy money it receives as a portion of patron losses, while in other departments Prosecuting Attorneys and their deputies are prosecuting players who wager on the turn of a card or the erratic roll of dice.

Mr. Justice R. W. Robins joins in this dissent.